STATE OF CONNECTICUT *v.* JOHN
SPRINGMANN, JR.
(AC 20316)

Landau, Schaller and Dupont, Js.

Argued December 11, 2001—officially released April 30, 2002

*Cameron Dorman*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Paul E. Murray*, state's

attorney, and *Elizabeth C. Leaming,* assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, John Springmann, Jr., appeals from the judgments of conviction, rendered after a jury trial, of five counts of risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1.[1] The defendant claims that (1) § 53-21 is unconstitutionally vague because providing alcohol to a minor under certain circumstances may be permitted under General Statutes (Rev. to 1995) § 30-86,[2] (2) § 53-21 is unconstitutionally vague and overbroad with respect to the display of pornographic material to minors, (3) the court improperly admitted pornographic videos and (4) the defendant's right to due process was violated when the trial court improperly failed to disclose exculpatory material after an in camera review of a victim's confidential records. We affirm the judgments of the trial court.

---

[1] General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1, provides: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child, shall be guilty of a class C felony."

[2] General Statutes (Rev. to 1995) § 30-86 provides in relevant part: "Any permittee, who, by himself, his servant or agent, sells or delivers alcoholic liquor to any minor, or to any intoxicated person, or to any habitual drunkard, knowing him to be such an habitual drunkard, shall be subject to the penalties of section 30-113. Any person who delivers or gives any such liquors to such minor, except on the order of a practicing physician, shall be fined not more than one thousand five hundred dollars or imprisoned not more than eighteen months, or both. The provisions of this section shall not apply . . . (3) to a delivery made to a minor by a parent, guardian or spouse of the minor, provided such parent, guardian or spouse has attained the age of twenty-one and provided such minor possesses such alcoholic liquor while accompanied by such parent, guardian or spouse."

The jury reasonably could have found the following facts. In 1993, one of the minor victims, C, was removed from her home, following allegations that her father had sexually assaulted her. C's father committed suicide in 1993 following the allegations. Her mother had abandoned the family several years earlier. C was placed by the department of children and families (department) under the care of her aunt and uncle in late 1993. In November, 1995, the relationship between C and the aunt and uncle became intolerable, and the aunt and uncle requested that she be placed immediately in another home.

In November, 1995, C was placed by the department in the care of the defendant. C was fifteen years old at the time of her placement with the defendant. The defendant resided in a house owned by D. The defendant and D had an especially close relationship, similar to that of a mother and son. When C moved into the home, the defendant's girlfriend and their baby were also living at D's residence. The defendant's girlfriend and their baby moved out shortly after C moved into the home.

The defendant and C had a tumultuous relationship due to disciplinary issues such as curfew. C enrolled in high school when she moved into the defendant's residence. Several days prior to beginning school, C and the defendant were sitting on the defendant's bed, and the defendant asked her if she had been a willing participant when she was sexually abused by her father. C responded that she was not, grew uncomfortable with the conversation and pretended to fall asleep. Later that evening, the defendant showed C episodes one and two of an animated Japanese pornographic movie entitled "Return of the Overfiend" on the videocassette recorder and television in the defendant's bedroom.

Two or three days later, C missed the school bus and returned to bed. When she arose around noon, C entered

the defendant's bedroom and found the defendant playing a video game on his computer. The defendant gave C a fifth of whiskey to drink. C had not eaten that day and she drank half of the bottle quickly. C became intoxicated and tired. She passed in and out of consciousness several times. When C awoke, she and the defendant watched parts one, two and three of a live-action, pornographic videotape entitled "Taboo" in the defendant's bedroom.

In November, 1995, the defendant and C drove to Massachusetts to pick up two of C's friends for a weekend visit at the defendant's residence. One of the friends who visited that weekend was the other victim, E. E was fourteen years old at the time of the incident. Shortly after they arrived at the defendant's residence, the defendant gave the three girls some beer and they watched a horror movie. E had two to three beers and C consumed five to six beers. This was the first time that C had consumed beer and she became intoxicated. The third girl, M, also consumed five to six beers.[3]

The next day, the defendant and the three girls were in the defendant's room. The defendant, C and M began playing a game of truth or dare, which involves daring a player to perform some act or to answer truthfully a question. Prior to the game, C drank two or three beers. During the game, the defendant dared C to dance in a sexual way and she refused. The defendant then dared C to simulate oral sex on a Coke bottle, and C performed that act. The defendant also dared C to lick something while blindfolded, and C also performed that act. C

---

[3] Charges against the defendant concerning the sexual assault of M were dropped following the state's presentation of its case-in-chief against the defendant due to the fact that M did not testify. The defendant made a motion for a judgment of acquittal with respect to two counts of risk of injury to a child involving M on the ground that there was insufficient evidence to demonstrate that M was under the age of sixteen. The court granted that motion with respect to the charges involving M.

then took the blindfold off and learned that she had licked a picture of a nude woman's genitals.

At some point during the weekend, the three girls were in the defendant's bedroom watching a movie with the defendant. The defendant then played an animated Japanese pornographic videotape. The defendant told the girls that he would take M and E back to Massachusetts if they did not watch the movie. M and C were drinking while they watched the movie. E thought that the movie was strange and it made her feel uncomfortable.

In June, 1996, C started drinking heavily and at times the defendant supplied her with alcohol. On one occasion, C testified that she came home drunk and entered the bedroom of the defendant. He was playing a game on his computer and told C that she should not go upstairs because she might awaken D. The defendant warned that if D woke up and learned that C was drunk, she would be upset. After C turned on the defendant's television, the defendant began to play a pornographic movie.

In June, 1996, the defendant furnished beer and other alcohol to C while she had friends visit the defendant's residence. C became intoxicated on that occasion. Also, in June, 1996, the defendant went to National Guard training in Texas, and C continued to drink heavily.

In October, 1996, an argument ensued between the defendant, D and C. C called the police and made allegations to the police and department representatives involving the defendant's behavior. As a result of these allegations, on October 17, 1996, C was removed from the defendant's residence.

On November 14, 1996, the police executed a search warrant and seized among other items, forty-five videotapes from the defendant's bedroom. Subsequently, C

identified fourteen videotapes that were shown to her by the defendant. Eleven of these videotapes were pornographic in nature, and C testified at trial that she had seen them in their entirety or portions of them in the defendant's bedroom during various activities.

The defendant was found guilty by a jury of two counts of risk of injury to a child in violation of § 53-21 with respect to E.[4] The defendant was also found guilty of three counts of risk of injury to a child in violation of § 53-21 with respect to C.[5]

The jury found the defendant not guilty of four counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), one count of aggravated sexual assault in the first degree in violation of § 53a-70a (a) (1), five counts of risk of injury to a child in violation of § 53-21 and one count of threatening in violation of General Statutes § 53a-62.

The defendant was sentenced to a total effective sentence of fifteen years imprisonment, execution suspended after seven years and five years probation. Additional facts will be set forth where necessary to address the issues on appeal.

I

The defendant first claims that § 53-21 is unconstitutionally vague as applied to his conduct of permitting a minor under his supervision to consume alcohol. The

[4] One count alleged that the defendant wilfully provided alcoholic beverages to a minor child. The second involved inducing a minor child to watch a pornographic videotape.

[5] One count involved inducing the victim to perform simulated oral sex on a bottle and to lick a pornographic picture depicting nudity and acts of sexual intercourse. A second count alleged that the defendant wilfully provided alcoholic beverages to a child. The third count alleged that the defendant wilfully displayed pornographic videotapes to a child.

defendant was convicted of one count of wilfully providing alcoholic beverages to C in violation of § 53-21 (a) (1) during the period from November 3, 1995, to October 18, 1996. The defendant was also convicted of wilfully providing alcoholic beverages to E in violation of § 53-21 (a) (1) during the period from November 24, 1995, to November 26, 1995.

"The void for vagueness doctrine accords due process protection in that it requires statutes (1) to provide fair notice of the conduct governed by them and (2) to prescribe minimum guidelines to govern law enforcement. . . . The defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement." (Citation omitted.) *State* v. *Hopkins*, 62 Conn. App. 665, 675–76, 772 A.2d 657 (2001).

The defendant claims that § 53-21 is unconstitutionally vague because the alleged conduct of providing alcohol to a minor is permissible under § 30-86[6] and, therefore, he did not have adequate notice that the delivery of alcohol to the minors was prohibited. We do not agree.

The defendant argues that the present case is similar to *State* v. *Perruccio*, 192 Conn. 154, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984). The *Perruccio* court found that § 53-21 was unconstitutionally vague as applied to the defendant because consensual sexual relations were permissible under General Statutes § 53a-73a (a) (1) (A) at the time that the events occurred. *State* v. *Perruccio*, supra, 163–65. The *Perruccio* court concluded that fair notice of the statutory requirements of § 53-21 was not afforded to the defendant because the activity was permitted under another statute. *Perruccio* is not applicable here

[6] See footnote 2.

because the defendant's activities were not permitted under § 30-86.

Section 30-86 prohibits the sale or delivery of alcohol to any minor, but provides an exception for delivery by a parent, guardian or spouse of the minor, provided such person has attained the age of twenty-one and provided such person accompanies the minor.

The defendant's argument fails because § 30-86 cannot apply to him. The statutory exception set forth in § 30-86 is for the delivery of alcohol by a parent, guardian or spouse of the minor. The defendant claims that his status as a care provider assigned by the department to supervise and provide care for C was the equivalent of a guardian relationship for purposes of § 30-86. The defendant cites no legal support for the argument that a care provider is the equivalent of a guardian.

In fact, the record is clear that the state of Connecticut maintained guardianship over the victim C at all times, even if she was in the foster care of the defendant. The definition of guardian contained in General Statutes (Rev. to 1997) § 45a-604 (5) provides that " '[g]uardianship' means guardianship of the person of a minor, and includes: (A) The obligation of care and control; and (B) the authority to make major decisions affecting the minor's education and welfare, including, but not limited to, consent determinations regarding marriage, enlistment in the armed forces and major medical, psychiatric or surgical treatment . . . ." It is clear that the state of Connecticut retained these responsibilities over C and the defendant was not a guardian. It is the commissioner of children and families who is a designated guardian and not a foster parent. See *Hunte* v. *Blumenthal*, 238 Conn. 146, 155, 680 A.2d 1231 (1996); see also General Statutes § 46b-129 (d).

The defendant also claimed that E's parents entrusted him with the care of E for the weekend. The defendant

argues that in receiving such permission, he assumed the responsibilities and duties equivalent to a guardian. This argument is not persuasive. There is no evidence in the record that the defendant was given permission by E's parents to serve alcohol to their child or to assume the duties of a legal guardian during the weekend when E visited the defendant's residence. The defendant's conduct of serving alcohol to minors did not fall within the exception created by § 30-86.

Our courts have determined that minors are not competent to assume the responsibility of consuming alcohol. See *Ely* v. *Murphy*, 207 Conn. 88, 93–95, 540 A.2d 54 (1988). Under the common law, an adult is required to exercise caution when permitting minors to consume alcohol. See *Bohan* v. *Last*, 236 Conn. 670, 671, 674 A.2d 839 (1996). The defendant served the alcohol to C and E in quantities sufficient for the minors to become intoxicated. There is no evidence that the defendant limited C's and E's consumption of alcohol or monitored their behavior for signs that they should discontinue drinking. The defendant's assertion that he was supervising C and E has not been established by the record.

The defendant's actions impaired the health and morals of a child and he was placed on notice that he could be held responsible for his actions. See id.; *Ely* v. *Murphy*, supra, 207 Conn. 93; see also *State* v. *Mancinone*, 15 Conn. App. 251, 276–77, 545 A.2d 1131 (defendant convicted of risk of injury to child for supplying alcohol and drugs to victims), cert. denied, 209 Conn. 818, 551 A.2d 757 (1988), cert. denied, 489 U.S. 1017, 109 S. Ct. 1132, 103 L. Ed. 2d 194 (1989).

The application of § 53-21 to the defendant's conduct was constitutional because the statute was not vague. The defendant placed C and E in a situation where their physical health was at risk and their morals could be impaired. See *State* v. *March*, 39 Conn. App. 267, 274–75,

664 A.2d 1157 ("deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and . . . acts directly perpetrated on the person of the minor and injurious to [the victim's] moral or physical well-being" constitute behavior that is prohibited by § 53-21 [internal quotation marks omitted]), cert. denied, 235 Conn. 930, 667 A.2d 801 (1995).

II

The defendant next claims that showing pornographic videotapes to C and E does not come within the purview of § 53-21 because it is unconstitutionally vague and overbroad. This is so, argues the defendant, because the prohibited behavior implicates the first amendment right to free speech and the fundamental constitutional right of parents to raise their children. Although the arguments were not raised at trial, we will review these claims because they are constitutional and the record is sufficient for review. *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

We first discuss the claim relating to the right of parents to raise their children. While the defendant can point to no constitutional provision explicitly guaranteeing parents' rights to raise their children as they see fit, "[t]he right to family autonomy and privacy acknowledged in the common law has been recognized as so fundamental as to merit constitutional protection." *Castagno* v. *Wholean*, 239 Conn. 336, 344, 684 A.2d 1181 (1996). Although the claim is constitutional, arising from the right of privacy under the ninth amendment to the United States constitution, it has no merit because, as previously discussed, the defendant is not a parent or legal guardian of either of the victims. We conclude that the application of § 53-21 to the defendant did not implicate the constitutional right of a parent to raise a child.

We next review the claim of the defendant that § 53-21 is vague and overbroad in violation of the first amendment right to freedom of speech. "As a general rule, the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue." *State* v. *Pickering*, 180 Conn. 54, 57, 428 A.2d 322 (1980). When, however, the first amendment is the basis for the void for vagueness claim, the constitutionality of the statute is tested for vagueness on its face. Id., 57–58 n.3. "[T]o prevail on a facial attack the plaintiff must demonstrate that the challenged law either could never be applied in a valid manner or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties." (Internal quotation marks omitted.) *New York State Club Assn., Inc.* v. *New York City*, 487 U.S. 1, 11, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988).

We review the claim keeping in mind that it is the defendant's conduct at issue, not the content of the pornographic movies on videotape that were not created by the defendant. To prevail on his first amendment claim, the defendant must prove beyond a reasonable doubt that § 53-21 is unconstitutional. See *State* v. *Breton*, 212 Conn. 258, 269, 562 A.2d 1060 (1989).

The defendant argues that the statute is void for vagueness as facially void. A facial challenge to a statute on the basis of a free speech deprivation is possible because any uncertain application of a statute may have a chilling effect on the first amendment. See *State* v. *Linares*, 232 Conn. 345, 355, 655 A.2d 737 (1995). If, however, the meaning of a statute can be ascertained through judicial construction, it will survive a claim that it is void for vagueness. *State* v. *Ryan*, 48 Conn. App. 148, 153, 709 A.2d 21, cert. denied, 244 Conn. 930, 711 A.2d 729, cert. denied, 525 U.S. 876, 119 S. Ct. 179,

142 L. Ed. 2d 146 (1998). The statute is saved from any facial invalidity as unconstitutionally vague because of the prior decisions of the Connecticut courts that give fair warning that certain conduct may result in an arrest.

The constitutionality of § 53-21 depends "upon a determination of the extent to which prior decisions of this court have supplied sufficient guidelines to save the statute from its facial invalidity." *State* v. *Schriver*, 207 Conn. 456, 462, 542 A.2d 686 (1988). The behavior of the defendant fits within the judicial gloss provided to the statute by the Connecticut cases interpreting the first prong of § 53-21. See *State* v. *Pickering*, supra, 180 Conn. 54; see also *State* v. *Delgado*, 243 Conn. 523, 707 A.2d 1 (1998); *State* v. *Payne*, 240 Conn. 766, 770–73, 695 A.2d 525 (1997); *State* v. *Cutro*, 37 Conn. App. 534, 537–42, 657 A.2d 239 (1995); *State* v. *Erzen*, 29 Conn. App. 591, 595, 617 A.2d 177 (1992); *State* v. *Tirado*, 21 Conn. App. 449, 456–60, 574 A.2d 252, cert. denied, 215 Conn. 816, 576 A.2d 546 (1990). There are cases subsequent to the defendant's alleged behavior where a defendant was found guilty under § 53-21 for showing pornographic movies to a child. See *State* v. *Slimskey*, 59 Conn. App. 341, 344, 757 A.2d 621 (2000), rev'd on other grounds, 257 Conn. 842, 779 A.2d 723 (2001); see also *State* v. *Lepri*, 56 Conn. App. 403, 405, 743 A.2d 626 (defendant showed pornographic movies and performed sexual acts on children), cert. denied, 253 Conn. 902, 753 A.2d 938 (2000). The defendant has not shown that the statute is overbroad because it unconstitutionally inhibits the protected speech of third persons. See *New York State Club Assn., Inc.* v. *New York City*, supra, 487 U.S. 11.

We amplify the provisions of § 53-21 with the definitional provisions of the Penal Code. See *State* v. *Erzen*, supra, 29 Conn. App. 597. The definitional section, General Statutes § 53a-193 (2), defines obscenity and related offenses of the Penal Code and provides a working

definition as being material "obscene as to minors" and includes material that "predominantly appeals to the prurient, shameful or morbid interest of minors . . . [which] taken as a whole . . . lacks serious literary, artistic, educational, political or scientific value for minors." The existing statutes indicate that the defendant and other putative defendants whose claims of constitutionally protected speech could be affected; see *New York State Club Assn., Inc.* v. *New York City*, supra, 487 U.S. 11; were on notice of the type of behavior encompassed within § 53-21.[7] We conclude that § 53-21 is not void as overly broad or vague as a deprivation of free speech.

### III

The defendant's third claim is that the court improperly admitted pornographic videotapes into evidence. The defendant makes two claims. First, he asserts that the court improperly admitted hearsay statements of a third party concerning the portions of the videotapes allegedly shown to the victims. The defendant's second claim is that the videotapes were admitted without a proper foundation. We do not agree with either of the defendant's arguments.

[7] The present case is unlike *Krukowski* v. *Swords*, 15 F. Sup. 2d 188 (D. Conn. 1998), which, although inapposite, is instructive in its discussion of federal and Connecticut decisions. The case involved a motion for summary judgment by a plaintiff who was previously charged with a violation of General Statutes § 53-21. The criminal charges against the plaintiff were dismissed, but the state publicly indicated that it would prosecute the plaintiff again if he were to engage in similar conduct with other minors. The plaintiff brought a federal civil rights action to enjoin the future application of § 53-21 against him because such application would violate the first and fourteenth amendments to the United States constitution. He claimed that the statute was unconstitutional because its application to him involved nonobscene, nonpornographic modeling sessions with consenting minor models whose parents had acquiesced in such sessions. The court granted his motion on the ground that the statute as applied to the plaintiff did not provide adequate notice that it proscribed the actions for which he was arrested. The court, however, found that the statute was not facially vague or unconstitutional in violation of the first amendment.

The following additional facts are relevant to this claim. C testified that on November 6, 1996, she gave a statement to Officer William Konieczny concerning the alleged improper conduct of the defendant. On November 14, 1996, the police executed a search warrant at the defendant's residence and seized, inter alia, forty-five videotapes from the defendant's bedroom. The videotapes were taken to the state police barracks and stored in a police locker. Konieczny testified that on November 16, 1996, C identified fourteen films from the group of forty-five that she had been shown by the defendant while she lived at his residence. C testified that two weeks prior to trial she met with Inspector Diane Davis-Morianos of the office of the state's attorney. At that meeting, C and Davis-Morianos viewed the videotapes and identified which videotapes C had seen in their entirety and what portions of the remaining videotapes she had viewed while with the defendant. At trial, C was shown a group of eleven videotapes and she testified that the defendant had shown her all or portions from all eleven videotapes.[8]

C also testified that the first occasion that she had seen one of the pornographic videotapes was prior to her beginning school in November, 1995. She testified that she had also seen pornographic videotapes on various occasions when the defendant would show her the videotapes or fail to turn them off when she entered his bedroom. In particular, she testified to two other specific instances with approximate dates where she was shown pornographic videotapes by the defendant, including the weekend that E had visited her.

Davis-Morianos testified that approximately one year before trial, C came to her office and again identified

---

[8] Eleven of the fourteen videotapes previously identified by C as having been shown to her by the defendant were considered pornographic in nature. During trial, therefore, only eleven videotapes were admitted into evidence.

the videotapes that were seized and which she had been shown by the defendant. At that time, C identified the videotapes only by title and did not review the contents of each videotape. Davis-Morianos also testified that she reviewed the contents of the videotapes with C approximately two weeks before the trial commenced and had marked which portions of the videotapes that C identified as having been shown to her by the defendant. The state moved to have the videotapes admitted into evidence during Davis-Morianos' testimony.

Defense counsel objected and argued that Konieczny and C had identified the videotapes only as a group and, therefore, a proper foundation had not been laid to admit the videotapes. The defense argued that each witness should have gone through each title and identified it as one having been seen by the victims.

The court disagreed and stated that the witnesses did look at the videotapes and that Davis-Morianos did, in fact, look at each videotape individually. The court also noted that "[a]ll they are is little titles," presumably referring to the fact that without viewing the videotapes, the only identifying marks are the titles. Defense counsel then stated that only C could testify as to what portions of each videotape she had seen. He argued that Davis-Morianos' testimony concerning which portions had been viewed by C was hearsay and the defendant was not given a chance to cross-examine C as to the identification of the individual videotapes. The state argued that Davis-Morianos' testimony was the equivalent of a police photographic lineup where the police officer would testify that a victim pointed out an alleged perpetrator. The court allowed the videotapes to be admitted into evidence.

The defendant argued that the cumulative effect of seeing several videotapes would prejudice the defense. The defendant was willing to stipulate that the video-

tapes were pornographic in nature. The state argued
that it was a jury determination to decide if the video-
tapes injured the mental health and morals of the minor
victims. The court agreed with the state and proceeded
to allow the evidence to be published to the jury.

On the following day, a juror asked if the jury was
going to be shown all of the videotapes or just portions.
In the juror's opinion, it was "almost like pointless to
see the whole thing like yesterday" and "[the presenta-
tion of the videotape] yesterday was kind of like over-
done." The court stated that the jury would not be
shown all of the videotapes. The jury was then shown
the remaining portion of the videotape that had been
presented during the previous day. The jury was shown
only those portions from the videotape that C had wit-
nessed with the defendant. Davis-Morianos then testi-
fied as to how much of each of the remaining videotapes
that C had been shown by the defendant. Finally, the
jury was shown a portion of a Japanese pornographic,
animated videotape. The videotapes were available to
the jurors during deliberations if they wanted to review
the portions they previously had been shown or if they
wanted to look at the remaining videotapes that had
not been published during the trial.

A

The defendant claims that the videotapes were
improperly admitted into evidence because a proper
foundation was not established. The defendant argues
that the state did not connect the videotapes to the
crime. The defendant also argues that the admission of
the videotapes unduly aroused the jurors' emotions,
and distracted the jury from the issues in the case and
focused their attention on the defendant's interest in
pornography. The defendant cites the juror's statements
following the publication of the first pornographic vid-
eotape as evidence that the evidence was highly prejudi-

cial. The defendant also claims that only those portions that were actually seen by the victims would have been relevant and the remaining portions were improper and highly prejudicial. We do not agree with the defendant's position.

Our standard of review "allows the trial court great leeway in deciding the admissibility of evidence. The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. . . . The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Bridges*, 65 Conn. App. 517, 521, 782 A.2d 1256, cert. denied, 258 Conn. 934, 785 A.2d 230 (2001).

The predicate for the admission of real evidence is the likelihood that the object was connected to the crime. See *State* v. *Bruno*, 236 Conn. 514, 551–52, 673 A.2d 1117 (1996); see also C. Tait, Connecticut Evidence (3d Ed. 2001) § 11.7.1, p. 800. The videotapes were connected to the crimes by the testimony of C, who identified all fourteen videotapes as those that were shown to her by the defendant. In addition, E and another witness testified as to the videotape that was shown in their presence.

The videotapes were clearly connected to the crime charged because the presentation of the videotapes was the basis for two counts involving § 53-21. The defendant's showing of the videotapes to minors demonstrated "deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . ." (Internal quotation marks

omitted.) *State* v. *March,* supra, 39 Conn. App. 274. The court ruled that the videotapes were relevant and that the probative value of the evidence outweighed any prejudice.

On appeal, the defendant further notes that portions of the videotapes that were not shown to C and E were introduced as evidence and that the jury could have been further prejudiced. The defendant did not object to the admission of videotapes on that basis and, therefore, that claim was not preserved. See *State* v. *Paris,* 63 Conn. App. 284, 291, 775 A.2d 994, cert. denied, 257 Conn. 909, 782 A.2d 135 (2001). Accordingly, we decline to review this claim.

B

The defendant also claims that Davis-Morianos' statements concerning which portions of the videotapes C told her that she had been shown by the defendant were hearsay and did not fall under any of the traditional exceptions to the prohibition against hearsay evidence. We do not agree.

"When there is a claim that evidence was improperly admitted, the standard of review is whether the ruling would likely affect the result of the trial." *Durso* v. *Aquilino,* 64 Conn. App. 469, 472–73, 780 A.2d 937 (2001). "A trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned only if a clear abuse of the court's discretion is shown and the defendant shows that the ruling caused substantial prejudice or injustice. . . . An appellate tribunal is required to make every reasonable presumption in favor of upholding the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Bryant,* 61 Conn. App. 565, 573, 767 A.2d 166 (2001).

The court ruled that Davis-Morianos' testimony was admissible under a hearsay exception for testimony by

a police officer corroborating a witness' out-of-court identification of a defendant during a photographic lineup. See *State* v. *Townsend*, 206 Conn. 621, 624, 539 A.2d 114 (1988). Our Supreme Court in *Townsend* held that "such testimony comes within an exception to the hearsay rule for testimony that is reliable and can be tested by cross-examination of the relevant witnesses." Id.

The testimony of Davis-Morianos was reliable in that the videotapes were identified by title following the seizure of the videotapes from the defendant's residence. C subsequently identified the videotapes again by title one year before trial. It is true that the contents of the videotapes were not reviewed by C until two weeks before trial, but given the explicitly graphic nature of the material to be identified, that delay is not significant. C also stated that she had seen several of the videotapes in their entirety, negating the need to identify which portions had been shown to her by the defendant and those portions that she did not observe. In addition, other witnesses testified that they had viewed portions of the videotapes.

Our Supreme Court has stated that the ability to cross-examine at trial is an important consideration when admitting out-of-court identifications. See *State* v. *Outlaw*, 216 Conn. 492, 497–98, 582 A.2d 751 (1990); *State* v. *McClendon*, 199 Conn. 5, 9–10, 505 A.2d 685 (1986). C was available for cross-examination during the trial concerning the identification procedure. The trial court did not abuse its discretion when it admitted the hearsay statements of Davis-Morianos concerning which portions of the videotapes C had seen.

IV

The defendant's final claim is that the court improperly failed to disclose exculpatory, favorable and material information contained in one of the victim's

department records following an in camera review of such records. We do not agree.

The following additional facts are relevant to this claim. The defendant subpoenaed department and psychological records of one of the victims. On May 15, 1998, the defendant filed a motion for an in camera inspection of the department and psychological records. The state obtained the consent of the victim to have the court review her department records. The records were marked as court exhibit A. The court determined that there was nothing exculpatory in nature in the department files and it did not disclose any information to the defendant. On June 15, 1999, the defendant filed a motion for a new trial. One of the claims in that motion was that the court failed to disclose exculpatory evidence from the victim's department file. That motion was denied on October 21, 1999.

The defendant seeks an independent review of the department records from this court to determine if there was any exculpatory information contained in the department records. See *State* v. *Esposito*, 192 Conn. 166, 180, 471 A.2d 949 (1984); *State* v. *Rosado*, 52 Conn. App. 408, 416, 726 A.2d 1177 (1999). Our standard of review for the refusal to disclose privileged records is abuse of discretion. See *State* v. *Olah*, 60 Conn. App. 350, 354, 759 A.2d 548 (2000).

After a careful and thorough review of the voluminous and sometimes duplicative records contained in the department file, we conclude that there was nothing exculpatory contained in the records. There was no abuse of discretion by the court in refusing to disclose the contents of any of the victim's department records to the defendant.

The judgments are affirmed.

In this opinion the other judges concurred.