STATE OF CONNECTICUT *v.* LUIS ORTIZ
(AC 23831)

Foti, Flynn and West, Js.

Argued February 23—officially released June 1, 2004

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Vicki Melchiorre*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Luis Ortiz, appeals from the judgment of conviction, rendered after a trial to the court, of assault in the first degree with intent to cause serious physical injury in violation of General Statutes § 53a-59 (a) (1), kidnapping in the second degree in violation of General Statutes § 53a-94, threatening in violation of General Statutes § 53a-62 (a) (1), carrying a dangerous weapon in violation of General Statutes § 53-206 (a) and criminal violation of a protective order in violation of General Statutes § 53a-223 (a).[1] The defendant received a total effective sentence of thirty years of incarceration, execution suspended after twenty years, and five years of probation.[2] Among the several conditions of probation it imposed, the court prohibited the defendant from having any contact with the victim and their three children. On appeal, the defendant contends that (1) the trial judge was required to recuse himself from presiding over the trial to the court because of admissions made in front of him by the defendant prior to trial, (2) the kidnapping statute is

---

[1] The defendant also was charged with attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (1), of which the court found him not guilty.

[2] The sentence was as follows: Count one, assault in the first degree, fifteen years, execution suspended after ten years, five years of probation with special conditions; count two, kidnapping in the second degree, fifteen years, execution suspended after ten years, five years of probation consecutive to count one; count four, threatening, one year to run concurrent with counts one and two; count five, carrying a dangerous weapon, five years to run concurrent with count one and two; and count six, violation of a protective order, one year concurrent with counts one and two.

void for vagueness under the facts of this case, (3) the condition of probation mandating "no contact" with the defendant's minor children is illegal and (4) the defendant's sentence for carrying a dangerous weapon is illegal.

The court reasonably could have found the following facts. The victim, Lourdes Suarez, was a woman with whom the defendant has lived and conceived three children. The defendant and the victim both worked for a West Hartford toy store and were required to work late. On the evening of November 14, 2000, the victim and the defendant were on their way home from work when the victim became frightened that the defendant might inflict harm on her because he was angry about missing a meeting with his drug dealer. Seeking help, she stopped at a police substation on Affleck Street in Hartford. After the victim rang the outside doorbell and no one answered, the defendant put his arms around her waist, and picked her up off of the ground and carried her out of the substation's doorway. The defendant showed her an open box cutter and then grabbed her by her jacket as she attempted to run away. He held her wrists together with one hand while he used his other hand to cut her face numerous times. The victim then fell to the ground, and the defendant again held her wrists with one hand while he used his other hand to cut her deeply on her hand and leg. Two individuals arrived at the scene, and the defendant fled. The victim was required to spend four days in a hospital, including two days in intensive care. She received multiple stitches and required surgery on her face to repair the nerves that had been damaged by the attack. She has since suffered from posttraumatic stress disorder and has attempted suicide on five occasions.

The defendant elected to testify at trial. When asked whether he denied injuring the victim, he replied: "[N]o . . . . From the beginning I've been saying . . . that I

did it. . . . It's not that I'm proud of what I've done because I feel like I was a coward for what I did . . . . I did it, you know." The defendant also testified that after he left the scene of the attack, he saw a police car drive past him, and he beckoned the officer to stop. At this point, the defendant testified, he told the officer, "I did it," and the officer drew his weapon. The defendant further testified that when he was placed in the police car, he told the officer "that I did what I did," and that he was not proud of it and deserved to be punished. Although the testimony of the arresting officer, David Dufault, disputed the manner in which the defendant claimed that he was apprehended, it nonetheless corroborated the defendant's testimony regarding his admission of guilt. Dufault testified that the defendant "threw his hands up in the air and started saying, I did it. I did it. I did it. I deserve what I get. Tell [the victim] I'm sorry."

The following procedural history is pertinent. The defendant had first elected a jury trial on the charges that are now the subject of this appeal and one additional charge of attempt to commit assault in the first degree on which he was found not guilty. The court, *Miano, J.*, expressed its concern that the defendant's chosen manner of dress might affect his right to a fair trial. While the case was still to be heard by a jury, the defendant appeared dressed in a red prison jumpsuit and expressed his reluctance to change out of it. In addressing the defendant on this subject, the court stated, "I had a brief discussion with the lawyers this morning, and they said—really, I think this is—it's good if you have any—if somebody admits their involvement, I think that should be factored into any kind of sentence or penalty if they're involved. However, now, when we have a panel, I don't want you to say anything that might be an admission or a confession or anything concerning, admitting to your commission of the crime. Because

right now, it's our job, it's my job to convince them what the law is. And the law is that you're presumed to be innocent unless and until the state can prove you guilty. If you're in the red outfit and you said, hey, I did it, but the time is too much or whatever, their job is going to be done for them. They're going to come back in eight seconds and say guilty. Now . . . that reflects on me and this court because I have to guarantee you, as much as I humanly can, a fair trial."

Although at that juncture the court had not invited the defendant to say anything about the case, the defendant responded: "I'm not saying I'm not guilty, and it's not because I'm proud of it. Like I told the judges before, just because I'm saying that I'm guilty doesn't mean that I'm proud of it. Because I'm not proud of hurting my—the woman that I thought I was going to marry for the rest of my life, the mother of my kids. . . . You know, but I just said the truth. I tell the truth, maybe the judge will have some consideration and maybe give me less time. I know that what I did is something serious. I'm not denying that. You know. I could have done something worse . . . ."

The court again cautioned the defendant not to say anything incriminatory in front of the jury, stating, "[w]hatever negotiations there were, I don't want to know, but apparently, there was no meeting of the minds. Apparently, my guess is, the state was looking for more time than you are, but that's their call. I can't force the state to accommodate you or any defendant in what the offer is going to be. So, now we're past that juncture about the negotiation of the case, on what you're going to get, what you're not going to get. Are you going to get more, are you going to get less; we're past that. You have a right to a trial. So, this is your trial. . . . What I am doing is asking you, I'm begging you not to say anything in front of the jury about whether or not you're involved. You have a right to a

trial. You have a right not to offer evidence. You have a right not to say anything. If, down the road, when it's your turn, you want to take the [witness] stand and say something, that's up to you and your lawyer. But if it's going to be done, if you want to communicate with the jury, it's got to be done in the orderly process of the case, and I would strongly urge you not to say anything in front of the jury that might hurt you."

The defendant later waived his right to a jury trial and elected to be tried by the court, which convicted him on all charges but attempt to commit assault in the first degree. The defendant now appeals from his conviction.

I

We first address the defendant's claim that the convictions must be reversed because, although the defendant never moved to recuse the trial judge, the judge had an obligation to recuse himself, sua sponte, where he had heard the defendant, prior to trial, make admissions on the record relating to his guilt. We disagree.

The defendant concedes that this issue is unpreserved but urges us that it is nonetheless reviewable under the plain error doctrine.[3] See Practice Book § 60-5. Alternatively, the defendant claims we should review this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because the sixth and fourteenth amendments to the United States constitution and the

---

[3] "To prevail under the plain error doctrine, the defendant must demonstrate that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . . This doctrine is not implicated and review of the claimed error is not undertaken unless the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Hooks*, 80 Conn. App. 75, 86, 832 A.2d 690, cert. denied, 267 Conn. 908, 840 A.2d 1171 (2003). We conclude that the defendant has not met that rigorous standard for obtaining plain error review.

constitution of Connecticut, article first, § 8, guarantee a criminal defendant a fair trial.

Although the defendant's claim meets *Golding*'s first two prongs because the record is adequate for review and the claim is of constitutional magnitude; id., 239; we conclude that the defendant's claim fails because he cannot satisfy *Golding*'s third prong, which requires him to show that a constitutional violation clearly exists and clearly deprived him of a fair trial.

We first observe that the record before us indicates that the defendant had made admissions to several other judges before appearing before Judge Miano. The defendant also advised the court that he had been offered by the state, but had not accepted, a twelve year sentence in exchange for his guilty plea.[4] The trial judge declined to recuse himself when that information was made known to him because he observed that the defendant serially had made this known to other judges to a degree of frequency he described as "ad saturatum." The court further advised that either party could request the court's disqualification, but stated that "if a defendant goes [to] one judge after another and advises him of that . . . it could be inferred that it's intentional to disqualify the court and to avoid trial time." Neither the state nor the defendant made a motion to disqualify the judge.

The defendant argues that principles of fairness and justice require a trial judge to recuse himself from a trial when he knows of inculpatory admissions made by the defendant and when the judge is the person responsible for deciding the defendant's guilt or inno-

---

[4] We include this history because it is pertinent to the defendant's penchant for making statements of this nature on the record to judges before whom he had appeared. The defendant has not claimed on appeal that the court should have disqualified itself because the defendant disclosed to the court his earlier plea negotiations, but rather confines his claim to the court's knowledge of the defendant's prior statements of guilt.

cence. The defendant first directs us to Practice Book § 1-22 (a), which provides in relevant part that a judicial authority shall be disqualified from acting in a matter "if such judicial authority is disqualified from acting therein pursuant to Canon 3 (c) of the Code of Judicial Conduct . . . ." Canon 3 (c) (1) (A) of the Code of Judicial Conduct requires a judge to recuse himself where "the judge has . . . personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

In reviewing these issues, we employ our long accepted reasonable person standard. "Canon 3C (1) of the Code of Judicial Conduct requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 746, 444 A.2d 196 (1982); E. Thode, Reporter's Notes to Code of Judicial Conduct (1973) p. 60 (standard is whether a reasonable [person] knowing all the circumstances would conclude that the judge's impartiality might reasonably be questioned)." (Internal quotation marks omitted.) *Tessmann* v. *Tiger Lee Construction Co.*, 228 Conn. 42, 57–58, 634 A.2d 870 (1993).

"Even in the absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority." (Internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 460–61, 680 A.2d 147 (1996). "A factual basis is necessary to determine whether a reasonable person, knowing all of the circumstances, might reason-

ably question the trial judge's impartiality. . . . It is a fundamental principle that to demonstrate bias sufficient to support a claim of judicial disqualification, the due administration of justice requires that such a demonstration be based on more than opinion or conclusion." (Citation omitted; internal quotation marks omitted.) *Advanced Financial Services, Inc.* v. *Associated Appraisal Services, Inc.*, 79 Conn. App. 22, 50, 830 A.2d 240 (2003).

We must first determine whether the judge's knowledge of the particular facts in this case would require recusal under canon 3 (c) of the Code of Judicial Conduct. Preliminarily, we observe that the defendant's admissions were part of a pattern that preceded Judge Miano's involvement with the case and continued after he presided, in which the defendant wanted to admit that he assaulted the victim and to express contrition in the hope that this would be considered in imposing his punishment. The defendant was intent on telling his story and expressing contrition to the arresting officer, several judges before whom he had appeared prior to his trial, and to the same trial judge, both pretrial and during his trial by the court. In determining whether recusal was required, we first look to the text of canon 3 (c), which states that a judge should disqualify himself or herself in a proceeding in which the judge's impartiality reasonably might be questioned, including but not limited to, situations in which the judge possesses "personal knowledge of *disputed* evidentiary facts concerning the proceeding . . . ." (Emphasis added.) Code of Judicial Conduct, canon 3 (c) (1) (A). In interpreting statutory language, no word is to be regarded as surplusage. See *State* v. *Walton*, 41 Conn. App. 831, 842–43, 678 A.2d 986 (1996). We find that this doctrine applies equally to the interpretation of rules such as canon 3 (c). The rule uses the adjective "disputed" to describe the disqualifying personal knowledge of facts. This

means that the judge's knowledge of factual assertions that are not disputed or debatable, and which are conceded by the defendant, do not serve to disqualify the judge. The defendant's pretrial admissions, which he now argues should have disqualified the judge, were consistent with his actual admissions made to the police at the time of his arrest and at trial during his testimony. Therefore, under the actual text of canon 3 (c), because the facts were not "disputed," the judge was not required to disqualify himself.

We also note that the judge's conduct in the present case conforms to the extrajudicial source rule, adopted by the United States Supreme Court, which provides that claimed bias or prejudice caused by knowledge of occurrences during a court proceeding is not grounds for disqualification. See *United States* v. *Grinnell Corp.*, 384 U.S. 563, 583, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966) ("[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case"); see also J. Shaman, S. Lubet & J. Alfini, Judicial Conduct and Ethics (3d Ed. 2000) § 4.05, pp. 116–17. The extrajudicial source rule was expanded in *Liteky* v. *United States*, 510 U.S. 540, 548, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994), to apply to disqualification based on alleged partiality as well as alleged bias or prejudice. We find *Liteky* persuasive because although the Supreme Court was interpreting 28 U.S.C. § 455 (b) (1), its provisions are substantially similar to canon 3 (c) (1) (A) of the Code of Judicial Conduct.[5] Here, the trial judge's knowl-

---

[5] Canon 3 (c) (1) provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (A) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ." The language of the analogous portion of the federal disqualification statute, 28 U.S.C. § 455, provides in relevant part: "(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding

edge of the defendant's admissions did not stem from an extrajudicial source, and, therefore, the court did not have an obligation to recuse itself under this doctrine.

The defendant contends that a line of cases in which a judge has engaged in prior plea bargaining are most analogous to the factual scenario presented here and require recusal. We disagree. The defendant cites *State v. Falcon*, 68 Conn. App. 884, 888, 793 A.2d 274, cert. denied, 260 Conn. 924, 797 A.2d 521 (2002), and *State v. Revelo*, 256 Conn. 494, 506 n.23, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001). In *Revelo*, our Supreme Court noted that the dangers of a judge hearing such a case include compromise of the judge's impartiality by his own perception of having a personal stake in the proposed plea agreement, and resentment toward a defendant who does not accept it and the danger that the judge may become an advocate or perceived advocate for his suggested resolution. *State v. Revelo*, supra, 506 n.23. Neither of these two rationales applies to the record before us. Judge Miano did not invite the defendant to discuss prior plea offers. Judge Miano made it very clear that he would not engage in plea bargaining with him and struck from the record the statement the defendant made about a prior sentence offer. The court therefore had no stake in any proposed, unaccepted plea resolution because it had not engaged in any plea bargaining or offers of plea. It is also plain that not only did the court not display any animus toward the defendant for rejecting a plea offer, but conscious of its role as a minister of justice, it actually extended itself to assure his fair treatment.

in which his impartiality might reasonably be questioned. (b) He shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

The *Revelo* court also recognized the danger that a defendant may make incriminating concessions during the course of plea negotiations. Id. We acknowledge that the record before us contains incriminating statements made by the defendant concerning his attack on the victim, but the record as a whole indicates that the defendant insisted on stating these things despite the judge's admonitions. *Falcon* was also a plea bargain case, whereas the factual scenario before us is not. In light of the entire record, the key to our inquiry must remain our standard of review, namely, whether a reasonable person would question the judge's integrity and fairness under the circumstances. We conclude that a reasonable person would not do so.

We next address the state's argument that the defendant, through his words and his conduct, waived any right to claim on appeal that the judge should have disqualified himself. After a thorough canvass of the defendant's decision during jury selection to give up his right to a jury trial and to elect a court trial, the judge told the defendant: "I've heard some comments that you made yesterday, and I'm saying that I'm not going to consider them at all, and I certainly will not." The court then told the defendant that he could not later claim, "Well, judge, you heard these comments, you're prejudiced against me." To this, the defendant responded, "I will not say that." The court further stated to the defendant, "I want the record to be 100 percent clear. You understand that." The defendant replied that he understood. Judge Miano then asked the defendant whether he understood that he likely would be the judge presiding over the nonjury trial, and the defendant replied that he did. The court further inquired whether he still wanted to waive his right to a jury trial, to which the defendant responded that he did. At that time, the defendant was represented by counsel. We agree with the state that the effect of the verbal exchange between

the defendant and the judge, coupled with the defendant's conduct in failing to make a motion to disqualify him, was a waiver of the defendant's right to disqualify the judge on grounds of bias or lack of impartiality. Under such circumstances, to permit the defendant to fail to make an objection to the judge hearing the case at trial and thereafter to make his first such objection on appeal, after the outcome of the case has been determined and the sentence imposed, would not only be an ambuscade of the trial judge, but would impermissibly permit a defendant to manipulate the judicial process. See *State* v. *DeGennaro*, 147 Conn. 296, 303, 160 A.2d 480 (defendants waived disqualification of trial judge by consenting in open court to judge), cert. denied, 364 U.S. 873, 81 S. Ct. 116, 5 L. Ed. 2d 95 (1960).

Our conclusion is also in harmony with General Statutes § 51-39 (c), which provides in relevant part that "[w]hen any judge . . . is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court." Although the defendant argues that the trial judge was required to disqualify himself sua sponte, he has provided us with no authority that would require us to find such an action to be necessary when both parties have consented in open court to allow the judge to hear the case.[6] In fact, we conclude that our precedent actually precludes us from so finding: "A judge should not hesitate to disqualify himself sua sponte where his participation in a matter would violate Canon 3 (C) of the Code of Judicial Conduct or General Statutes § 51-39 *unless* he obtains the parties' consent to his participation in open court pursuant to

---

[6] General Statutes § 54-33f prohibits a judge who signed a search warrant from hearing a motion to suppress arising out of the execution of that warrant. General Statutes § 51-183c prohibits a judge who presided over a court trial from retrying a case where a new trial is granted or the judgment is reversed. That statute also carries a similar prohibition against the same judge presiding where a new trial is granted in a jury case. No statute prohibits a judge from acting under the circumstances of this case.

General Statutes § 51-39 (c)." (Emphasis added.) *State v. Maluk*, 10 Conn. App. 422, 427, 523 A.2d 928 (1987). We therefore reject the defendant's argument. Further, where a trial court states on the record that it will not consider certain evidence, "[t]here is no reason to believe [it] could not do so, or that a reasonable person would have cause to question [its] ability to do so." (Internal quotation marks omitted.) *State v. Cobb*, 251 Conn. 285, 378, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). The defendant has not established that a constitutional violation clearly existed that deprived him of his right to a fair trial, as required under *Golding*'s third prong.

Finally, when a defendant claims that a judicial error is of constitutional magnitude, if he establishes that such error constituted a clear constitutional violation, it becomes the state's burden to prove that the error was harmless beyond a reasonable doubt. *State v. Golding*, supra, 213 Conn. 240. We conclude that even if we were to decide that such a clear violation existed, the state satisfied this burden of showing harmlessness in directing us to the record of the defendant's trial testimony. At trial, the defendant elected to testify and did so on the record in a manner consistent with the pretrial admissions he made to Judge Miano. The defendant's claim therefore fails under both *Golding*'s third and fourth prongs.

## II

We next turn to the defendant's claim that our statute proscribing kidnapping in the second degree, § 53a-94 (a), is unconstitutionally vague under the fifth and fourteenth amendments to the United States constitution and the constitution of Connecticut, article first, § 8, as applied to this defendant. Again, this issue is unpreserved, and the defendant seeks review under *State v. Golding*, supra, 213 Conn. 239–40. The record is ade-

quate for review, and the claim is of constitutional magnitude. We therefore afford the defendant review under *Golding* to determine whether a constitutional violation clearly existed and, if so, whether it caused harm to the defendant. Our review of this claim is plenary because the claim involves the interpretation of a statute. See *State* v. *Swain*, 245 Conn. 442, 451, 718 A.2d 1 (1998).

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender* v. *Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) . . . . [The doctrine] embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . The United States Supreme Court has emphasized that the more important aspect of the vagueness doctrine is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Thus, [i]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited . . . and must not impermissibly [delegate] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . Finally, [i]f the meaning of a statute can be fairly ascertained a statute will not be void for vagueness . . . for [i]n most English words and phrases there lurk uncertainties. . . . [T]he statute must contain some core meaning within which the defendant's actions clearly fall. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to

ascertain a statute's meaning to determine if it gives fair warning." (Citations omitted; internal quotation marks omitted.) *State* v. *McMahon*, 257 Conn. 544, 551–53, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002). "For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue." (Internal quotation marks omitted.) *State* v. *Jones*, 215 Conn. 173, 180, 575 A.2d 216 (1990).

We apply these principles to the particular statutory language in light of the facts of this case. General Statutes § 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he abducts another person."[7] The statute, thus, by its plain terms, gives fair warning to the public that if a person abducts another, he is guilty of that offense. The particular facts in the record before us do not convince us that application of the statute was arbitrary or discriminatory, and we conclude that its prohibitions could be understood by a person of ordinary intelligence.

Our kidnapping statutes do not require proof of restraint for any length of time or asportation for any distance to establish an "abduction." *State* v. *Green*, 55 Conn. App. 706, 716, 740 A.2d 450 (1999), cert. denied, 252 Conn. 920, 744 A.2d 438, cert. denied, 529 U.S. 1136, 120 S. Ct. 2019, 146 L. Ed. 2d 966 (2000). Our Supreme Court has stated: "We recognize that common notions

---

[7] General Statutes § 53a-91 (2) defines "abduct" as "[restraining] a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." Further, "restrain" is defined by General Statutes § 53a-91 (1) as "restrict[ing] a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent . . . ."

regarding the crime of kidnapping envisage the carrying away of a person under coercion and restraint. Although this type of movement undoubtedly can serve as the basis for kidnapping, our kidnapping statute does not require such movement. Rather, all that is required under the statute is that the defendant have abducted the victim and restrained her with the requisite intent. . . . [T]he abduction requirement is satisfied when the defendant restrains the victim with the intent to prevent her liberation through the use of physical force. Further, the victim is restrained when the defendant, acting with the intent to inflict physical injury upon her . . . moves her from one place to another *or* restricts her movement by confining her in the place where the restriction commenced." (Citation omitted; emphasis in original.) *State* v. *Luurtsema*, 262 Conn. 179, 201, 811 A.2d 223 (2002).

Although we can conceive of factual situations in which overcharging a defendant with kidnapping based on "the most minuscule movement would result in an absurd and unconscionable result"; (internal quotation marks omitted) *State* v. *Jones*, supra, 215 Conn. 180; we do not conclude, on the basis of the record before us, that such a result has occurred. Testimony from the victim established that the defendant physically lifted her off of the ground to move her out of the police substation in which she had sought help, and when the victim attempted to flee, he grabbed her by her coat to prevent her from escaping. The victim also testified that the defendant twice grabbed her wrists with one hand as he cut her repeatedly with the other, once while she was standing and then again when she fell to the ground. The testimony elicited at trial established that the defendant intended to abduct the victim in that he restrained her by both moving her from one place to another and also by preventing her liberation through the use of physical force. The facts do not support the defendant's contention that these actions comprised a "minuscule

movement . . . ." (Internal quotation marks omitted.) Id.

We next address the defendant's argument that because the assault could not have been accomplished without confinement, an absurd or unconscionable result is reached by finding the defendant guilty of kidnapping. We disagree. Although we are aware that other jurisdictions have determined that the crime of kidnapping must be found to be severable from, and not incidental to, an underlying crime for a defendant to be found guilty; see, e.g., *People* v. *Levy*, 15 N.Y.2d 159, 164–65, 204 N.E.2d 842, 256 N.Y.S.2d 793, cert. denied, 381 U.S. 938, 85 S. Ct. 1770, 14 L. Ed. 2d 701 (1965); *State* v. *Goodhue*, 175 Vt. 461, 833 A.2d 861 (2003);[8] the fact that the defendant committed the crime of kidnapping in the course of committing another crime is not determinative under our law. We are constrained by precedent from our Supreme Court, which has held that "[w]here the requisite intent is present, the fact that the perpetrator's underlying motive for the detention is the consummation of another crime . . . does not preclude a conviction for kidnapping." *State* v. *Lee*, 177 Conn. 335, 344, 417 A.2d 354 (1979). Furthermore, our legislature "[has] not seen fit to merge the offense of kidnapping with other felonies, nor impose any time requirements for restraint, nor distance requirements for asportation, to the crime of kidnapping. . . . [A]ny argument that attempts to reject the propriety of a kidnapping charge on the basis of the fact that the underly-

[8] See, for example, the Illinois Appellate Court's adoption of the following standard to determine whether an asportation or detention rises to the level of kidnapping as a separate offense: "(1) the duration of the asportation or detention; (2) whether the asportation or detention occurred during the commission of a separate offense; (3) whether the asportation or detention that occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense." *People* v. *Jackson*, 281 Ill. App. 3d 759, 768, 666 N.E.2d 854 (1996).

ing conduct was integral or incidental to the crime [with which the defendant was charged] . . . must fail. . . . It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature." (Citations omitted; internal quotation marks omitted.) *State* v. *Luurtsema,* supra, 262 Conn. 202.

Because we conclude that the defendant's actions were clearly proscribed by § 53a-94, as interpreted by our Supreme Court, we hold that, as applied to the facts of this case, the statute is not unconstitutionally vague, and the defendant has not established a clear violation of his constitutional rights. We therefore reject the defendant's argument.

### III

We next turn to the defendant's challenge to the condition of his probation prohibiting him from contacting his children until they reach age eighteen. The defendant claims that this "no contact" condition is illegal.

The state has raised a threshold issue as to whether this claim is reviewable. It maintains that the defendant's claim is wholly speculative because the condition he challenges may never come into effect because the children probably will have reached the age of majority by the time the defendant is released from incarceration. The defendant counters that this issue is ripe for review and points out that this court has in fact reviewed a condition of probation consisting of restitution to be completed by the end of a third year of probation despite the fact that the defendant was still incarcerated. See *State* v. *Thornton,* 55 Conn. App. 28, 30–31, 739 A.2d 271 (1999). He also argues that the state's ripeness argument would render superfluous Practice Book §§ 43-32 and 61-13, which permit a defendant to file a motion to stay the inception of probation while an appeal is taken. We agree with the defendant

that the existence of these rules of practice is persuasive in determining whether a condition of probation may be challenged prior to the commencement of probation because, if the challenge is possible only after probation commences, then there would be no need to stay the provision of probation until after the defendant is released and the appeal has been decided.

The state also argues that the defendant is not deprived of a remedy because he can challenge probation conditions in a probation revocation proceeding after he is arrested for violating this condition. We agree with the defendant that the matter is ripe. "[I]t is not necessary that [a] petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel* v. *Thompson*, 415 U.S. 452, 459, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974).

Finally, the defendant makes a strong argument that failure to appeal directly from a judgment containing probation conditions could result in a waiver of his right to challenge such conditions at a later time. See *United States* v. *Johnson*, 138 F.3d 115, 117–18 (4th Cir. 1998); *State* v. *Austin*, 165 Vt. 389, 401–402, 685 A.2d 1076 (1996). We conclude that the defendant should have access to the courts for judicial review now rather than risk loss of parental rights. We thus reject the claim that the matter is not ripe for review.

The defendant did not preserve this issue by interposing any objection to the no contact provision at the time he was sentenced. The defendant claims it is reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40. We agree. The record is adequate for review, and the claim is of constitutional magnitude, as it alleges a violation of a fundamental right, namely, the right to family integrity, which "includes the most essential and basic aspect of familial privacy—the right of the family to remain

together without the coercive interference of the awesome power of the state." (Internal quotation marks omitted.) *Castagno* v. *Wholean*, 239 Conn. 336, 343, 684 A.2d 1181 (1996).[9] Consequently, we review the claim under *Golding*'s third prong to determine whether the alleged constitutional violation clearly exists.[10] *State* v. *Golding*, supra, 240. Total deprivation of the defendant's right of contact with his children is harmful. Because we conclude that there was a constitutional violation, but only in the breadth of the order, which occurred at sentencing, we remand this matter to the trial court to amend the condition of probation, and we do not further analyze whether the violation was harmless in accord with *Golding*'s fourth prong.

The defendant first argues that there is no authority under General Statutes § 53a-30 to impose such a condition. Section 53a-30 (a) of the General Statutes, entitled "Conditions of probation and conditional discharge," lists sixteen separate conditions which might be imposed by the court. The defendant indicates that subdivision sixteen is the only part of the statute that could relate to the conditions imposed. Section 53a-30 (a) (16) provides that the court may require a probationer to "satisfy any other conditions reasonably related to the defendant's rehabilitation," and, the defendant contends, this condition does not so reasonably relate. We disagree. The comment of the commission to revise criminal statutes, which first proposed adoption by the legislature of our present criminal code over thirty years ago, as to § 53a-30 provides in relevant part: "This sec-

[9] See also *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) (interest of person in his children "undeniably warrants deference and, absent a powerful countervailing interest, protection").

[10] Although *Golding*'s third prong also normally requires a determination of whether the violation deprived the defendant of a fair trial, the challenged violation occurred during the posttrial sentencing phase. Therefore, we need not analyze whether the defendant's right to a fair trial was violated by the imposition of the condition of probation.

tion sets out, as a kind of guideline, the general conditions that the court may impose on the sentence of probation . . . . The list is not intended to be exhaustive . . . ." Commission to Revise the Criminal Statutes, Penal Code comments, Connecticut General Statutes Annotated § 53a-30 (West 2001), commission comment. Because we also conclude that the list set forth in § 53a-30 was meant to be illustrative, and not exhaustive, we reject outright the defendant's argument that the probation condition imposed was improper on the basis of a lack of the necessary statutory nexus between the condition and the desire to rehabilitate the defendant expressed in § 53a-30 (a) (16). Our view is consistent with our Supreme Court's statements in *State v. Pieger*, 240 Conn. 639, 647, 692 A.2d 1273 (1997), that probation's objectives are not just to foster the offender's reformation, but also "to preserve the public's safety," and that "a sentencing court must have the discretion to fashion those conditions of probation it deems necessary to ensure that the individual successfully completes the terms of probation." (Internal quotation marks omitted.) The court was confronted with the particular situation of the defendant and was in the best position to evaluate the type of probation condition that would best effectuate the dual goals of rehabilitation and preservation of the public's safety. The court found that the defendant had engaged in an unprovoked, violent attack on the woman with whom he had lived and who was also the mother of three of his children.

At the sentencing hearing, the prosecutor told the court that the victim had relayed to him detailed accounts of the defendant's abuse of the children, including one instance when he had put a sock in the mouth of his one year old child and put tape over it to stop the baby from crying. In addition, the state alerted the court that the department of children and families

in another state had dealt with an incident involving one of the defendant's other children, whose mother was someone other than the victim, in which he allegedly shook a small baby and caused the child to suffer brain damage. The defendant did not contest or deny either of these allegations at the sentencing hearing.

Although there was no evidentiary hearing conducted with regard to these allegations, "due process does not require that information considered by the trial judge prior to sentencing meet the same high procedural standard as evidence introduced at trial. Rather, judges may consider a wide variety of information. . . . [T]he trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance. . . . It is a fundamental sentencing principle that a sentencing judge may appropriately conduct an inquiry broad in scope, and largely unlimited either as to the kind of information he may consider or the source from which it may come. *United States* v. *Tucker*, 404 U.S. 443, 446, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972)." (Citations omitted; internal quotation marks omitted.) *State* v. *Pereira*, 72 Conn. App. 545, 586, 805 A.2d 787 (2002), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003). In light of the information the court had before it at sentencing, the court was warranted in its concern of not just protecting the victim, but also her offspring.

However, the defendant also attacks the breadth of the order, which proscribes *all* contact with his children. We acknowledge that "[c]hoices about marriage, family life, and the upbringing of children are among associational rights [the United States Supreme Court] has ranked as of basic importance in our society . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." (Citation omitted; internal quotation marks omitted.) *M.L.B.* v. *S.L.J.*, 519 U.S. 102, 116, 117 S. Ct.

555, 136 L. Ed. 2d 473 (1996). A prohibition on contact with one's children affects the defendant's associational rights. Although we hold that the court was warranted in severely restricting the defendant's contact with his children in furtherance of the goal of probation to protect them as members of the public, that restriction should not reach further than is reasonably necessary for the preservation of the children's safety. A strict application of the court's order appears to prohibit the defendant from sending even a birthday card to his children. Yet, it is difficult to imagine how such mail contact could jeopardize their safety. We conclude that a blanket prohibition of all such contact with the children is violative of the defendant's constitutional rights. We therefore reverse the order only insofar as it prohibits mail contact and remand the case to the court with an instruction to tailor the "no contact" provision to allow the defendant to have at least reasonable mail contact with his children, conditioned in the court's discretion so that it will be conducted in such a manner as the court determines would not endanger their safety.

IV

The defendant's final claim is that the court's sentence of five years of incarceration for the crime of carrying a dangerous weapon in violation of § 53-206 (a) is illegal. We agree.

The state concedes that the defendant's claim of illegality is well founded. Section 53-206 (a) provides in relevant part that a defendant "shall be fined . . . or imprisoned not more than three years or both . . . ." A sentence that exceeds statutory limits is illegal. *Cobham* v. *Commissioner of Correction*, 258 Conn. 30, 38, 779 A.2d 80 (2001). It is reviewable on direct appeal, even when the defendant did not object when it was imposed or move to correct it. *State* v. *Constantopolous*,

68 Conn. App. 879, 882, 793 A.2d 278 (" '[b]oth the trial court and this court, on appeal, have the power, at any time, to correct a sentence that is illegal' "), cert. denied, 260 Conn. 927, 798 A.2d 971 (2002).[11] The sentence of five years is ordered vacated because it exceeds the three year maximum penalty the law provides. The case is remanded for resentencing to a term that does not exceed the statutory maximum.

The judgment is reversed as to the defendant's condition of probation ordering no contact with his children until they reach the age of majority and the case is remanded with instructions upon resentencing to appropriately tailor the condition in a manner consistent with this opinion and in accord with the defendant's constitutional rights. The judgment is also reversed as to the sentence on the conviction of carrying a dangerous weapon in violation of § 53-206 (a) and the case is remanded for resentencing in accordance with law. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[11] See also Practice Book § 43-22, which provides that "[t]he judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner or any other disposition made in an illegal manner."