# STATE OF CONNECTICUT *v.* KEITH B.[1]
## (AC 26223)

Gruendel, Harper and Pellegrino, Js.

Argued February 6—officially released May 30, 2006

[1] In accordance with our policy of protecting the privacy interests of victims of sexual abuse, we decline to use the defendant's full name or to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

*Jodi Zils Gagne,* special public defender, for the appellant (defendant).

*Lisa A. Riggione,* senior assistant state's attorney, with whom were *Bonnie R. Bentley Cewe,* assistant state's attorney, *Matthew A. Crockett,* deputy assistant state's attorney, and, on the brief, *Patricia M. Froehlich,* state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Keith B., appeals from the judgment of conviction, rendered after a trial to the court, of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), two counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (4), risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[2] On appeal, the defendant claims that the court improperly (1) denied his motion for a judgment of acquittal and (2) denied his motion for a new trial. We affirm the judgment of the trial court.

The memorandum of decision filed by the trial court reveals the following facts. "[The defendant] married [the victim's mother] on August 15, 1996, in Southbridge, Massachusetts. The defendant's date of birth is December 2, 1962. Shortly after their marriage, [the victim's mother] regained custody of [the victim], born February 11, 1986, who had been in foster care for several years. In December, 1999, the defendant, [the victim and her mother] moved to a five room apartment located in a four apartment unit . . . .

"The defendant was not employed at this time due to a disability for which he received social security benefits. [The victim's mother] obtained sporadic

[2] The court sentenced the defendant to a total effective term of fifteen years imprisonment followed by fifteen years of special parole.

employment over the next two years on either the first or second shifts at two local businesses. [The victim] enrolled [at a local school] and took special education classes. She is cognitively limited with a full scale IQ of 64. In 2001, while [in high school], she was functioning in the mild mental retardation range of intelligence according to a psychological report of . . . Wendy Underhill, [a physician who] was ordered by the [court to conduct an evaluation].

"The defendant was a primary caretaker of [the victim] on a daily basis during 2000 and 2001. [The victim's mother] was often working during the day or early evening. The defendant rarely left the apartment. He saw to it that [the victim] left for school on time and returned after school. He shopped with her and bought her [clothing]. He was in charge of supervising household chores assigned to her, and he disciplined her when she did not do them to his satisfaction. The defendant also imposed punishment when [the victim] misbehaved. It ranged from being required to stand or kneel in a corner, to being struck on the bottom with a Ping-Pong paddle. He paid the household bills and gave money to [the victim] when she needed it. Often, he would stay up late in the evening playing computer games and watching pornography on various sites on the Internet. The defendant and [the victim's mother] watched pornographic movies together and read pornographic magazines. Often, the magazines and videotapes were left in plain view in the apartment. A television was located in the living room and in the defendant's bedroom upstairs. [The victim] had her own bedroom upstairs. On two occasions, once in the living room and once in the defendant's bedroom, the defendant and [the victim] watched pornographic tapes together.

"While at [high school, the victim] sent sexually explicit notes to a fellow student and initially denied

doing so. Additionally, other teachers thought that she was prone to lie about things. Sometime in early 2001, the defendant and [the victim], along with [her mother], went to an evening auction in . . . Rhode Island, something they did regularly. [The victim] saw a lamp that she liked. The defendant offered to buy it for her if she would do something for him. This conversation was overheard by [the victim's mother]. After buying the lamp, all three returned [home]. Later that evening, after [the victim's mother] had gone to sleep, the defendant called to [the victim] in her bedroom, to come downstairs to the living room. She did so in her pajamas. The defendant was sitting in his reclining chair naked and ordered [the victim] to perform oral sex on him. She did so and returned to her room.

"On another occasion, in late winter or early spring of 2001, the defendant entered [the victim's] bedroom in the early evening. He disrobed and began to have sexual intercourse with [the victim]. [Her mother], who had been downstairs, came upstairs to the bedroom door and observed the defendant and [the victim] engaged in sexual intercourse but said nothing and returned downstairs. [The victim] and [her mother] discussed the incident the next morning. Neither the police nor [the department of children and families (the department)] was notified. . . .

"In the late spring of 2001, the defendant entered the bathroom where [the victim] was taking a shower. He disrobed, entered the shower and began to fondle [the victim]. The defendant touched her breasts with his hands and his penis made contact with her vagina and buttocks. [The victim's mother], who was downstairs, heard them, went upstairs and entered the bathroom. She observed [the victim] performing oral sex on the defendant and ordered [the victim] to get out of the shower. [The victim's mother] returned downstairs but [recalled] hearing [the victim] return to the bathroom

where the defendant remained. The next day [the victim and her mother] discussed the incident. No complaint was made to the police or [the department].

"In late June, 2001, [the victim] was removed from the apartment based upon her complaint to [the department] that she was being physically abused by the defendant and [her mother]. [The department] had opened a neglect file in 1999 and, after an adjudication, an order of protective supervision had entered. [The victim] remained in the home. After the 2001 complaint, an order of temporary custody dated June 27, 2001, entered, and custody of [the victim] was granted to [the department] and [the victim] was placed in foster care . . . . In September, 2001, a second psychological evaluation was completed as the result of the new neglect file. The evaluator concluded that [the victim] had exhibited significant sexual promiscuity over the past year (based on [the] questionable self-reporting of frequent sex with two young men). The evaluation noted that she was an apparent chronic liar but that she lied in an impulsive, rather than premeditated and planned manner. Further, the evaluator found that [the victim] had been exposed to pornography in the home and that she had received frequent corporal punishment at the hands of [the defendant]. The evaluator recommended that [the victim] remain in foster care for at least ten more months.

"In February, 2002, [the victim became] sixteen years old and voluntarily left foster care . . . . She returned to [the apartment] where the defendant and [her mother] continued to reside, although [her mother] had left the defendant on at least one occasion to reside with [N, a former boyfriend] and his family . . . . Within two months [of the victim's] return, the defendant again summoned [the victim] to his bedroom where he began to have sexual intercourse with her. [The victim's mother] saw this incident as well, but

contrary to her assurances to [the victim] that she would protect her if she came home, nothing was done to report the incident.

"In March, 2002, [the victim and her mother] went to . . . live with [N and his family], with whom they had previously stayed for a short period of time in 2001 prior to [the victim's] entering foster care. [The victim's mother] stayed about a month and returned . . . to reside with the defendant. [From March, 2002, the victim remained with N and his family and attended high school].

"In May, 2002, [J, who is N's wife], asked [the victim] why she did not wish to have a certain item that she saw at a local flea market. [The victim] replied that it was because she would have to do sexual things to get it. The next day, [J and N] asked [the victim] to explain what she meant by that remark. [The victim] made a full disclosure of the sexual conduct of the defendant, and the acquiescence of [her mother] regarding his actions. [J and N] went to the . . . police." Additional facts will be set forth as necessary.

## I

The defendant first claims that the court improperly denied his motion for a judgment of acquittal. We disagree.

Although the defendant purports to challenge the sufficiency of the evidence to support the conviction, his argument disputes only the court's assessment of the witnesses' credibility. The defendant does not argue that the state failed to present evidence that was probative of each of the elements of the crimes of which he was convicted or that the evidence that was presented was insufficient to establish his guilt beyond a reasonable doubt. Rather, he contends that the court should have granted the motion for a judgment of acquittal

because the victim and her mother, who were the only state's witnesses that provided any direct evidence against the defendant, were thoroughly impeached at trial. Consequently, it would serve no useful purpose for us to discuss the evidence presented at trial that supported the defendant's conviction. We focus, instead, on the claim presented.

"Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the [finder] of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Liborio A.*, 93 Conn. App. 279, 284, 889 A.2d 821 (2006).

The defendant's claims regarding the credibility of the victim and her mother were raised properly at trial. Our review of the evidence and the court's memorandum of decision reveals that the court thoroughly considered the witnesses' biases and any weaknesses in their testimony and, nonetheless, found that the victim and her mother were credible with respect to the events in question. "The scope of our factual inquiry on appeal is limited." (Internal quotation marks omitted.) *State* v. *Estrada*, 71 Conn. App. 344, 350, 802 A.2d 873, cert. denied, 261 Conn. 934, 806 A.2d 1068 (2002). "The sifting and weighing of evidence is peculiarly the function of the trier. [N]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony. . . . The trier is free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Rollar Construction & Demolition, Inc.* v. *Granite Rock Associates, LLC*, 94

Conn. App. 125, 132, 891 A.2d 133 (2006). We decline the defendant's invitation to second-guess the court's assessment of competent evidence presented at trial. This evidence amply supported the court's findings, which were a sufficient basis for the conviction at issue.

II

The defendant next claims that the court improperly denied his motion for a new trial. We disagree.

Immediately before the defendant was sentenced, he filed a motion for a new trial. The defendant alleged that, at some point during the trial, his mother overheard a conversation between an unidentified woman and either the court clerk or the judicial marshal. The defendant further alleged that his mother thought that the woman might have been a judge because she was wearing a suit and looked "official." This woman allegedly approached the clerk's desk, looked at the evidence on the desk, and commented to the clerk that the defendant "was obviously guilty." Although the defendant did not provide the court with an affidavit regarding this incident, he nevertheless sought a new trial on the ground that, if this comment was made, if the individual who made the comment was a judge, and if this information was relayed to the court, *Potter, J.*, it might have affected Judge Potter's ability to be fair and impartial in his decision. The court denied the defendant's motion, stating that it had not spoken with anyone about the defendant's case.

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a new trial],

we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Lambert*, 70 Conn. App. 583, 586–87, 799 A.2d 335, cert. denied, 261 Conn. 942, 808 A.2d 1135 (2002).

Although the defendant casts his claim as a motion for a new trial on the basis of newly discovered evidence, he essentially claims that the court improperly denied his motion because Judge Potter should have recused himself to avoid the appearance of partiality. In reviewing this issue, we look to the Code of Judicial Conduct. "Canon 3 (c) (1) of the Code of Judicial Conduct requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . .

"Even in the absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority. . . . A factual basis is necessary to determine whether a reasonable person, knowing all of the circumstances, might reasonably question the trial judge's impartiality. . . . It is a fundamental principle that to demonstrate bias sufficient to support a claim of judicial disqualification, the due administration of justice requires that such a demonstration be based on more than opinion or conclusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 83 Conn.

App. 142, 150–51, 848 A.2d 1246, cert. denied, 270 Conn. 915, 853 A.2d 530 (2004).

As demonstrated by the defendant's argument, both to the trial court and to this court on appeal, his claim that Judge Potter's impartiality reasonably could be questioned was based solely on speculation and conjecture. He argues that, *if* the individual who spoke to the clerk or the marshal was a judge, and *if* that individual spoke to Judge Potter, that comment or information *may* have affected Judge Potter's ability to render an impartial decision. The defendant, however, offered no evidence that the individual who spoke to the clerk or marshal was a judge or that she spoke with Judge Potter. Indeed, the defendant did not even provide the court with an affidavit from his mother relating to the events in question. Under these circumstances, the court did not abuse its discretion in denying the defendant's motion for a new trial.

The judgment is affirmed.

In this opinion the other judges concurred.