STATE OF CONNECTICUT *v.* GREGORY B. WINOT
(AC 25186)

Schaller, Gruendel and Peters, Js.

Argued February 14—officially released May 16, 2006

*Jon L. Schoenhorn*, with whom was *Jennifer L. Bourn*, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Donna Mambrino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PETERS, J. This criminal appeal arises out of allegations that the defendant, Gregory B. Winot, forcibly took a twelve year old girl by the arm and attempted to pull her toward his parked vehicle. After a jury trial, the defendant was convicted of kidnapping in the second degree in violation of General Statutes § 53a-94 (a),[1] attempt to commit kidnapping in the second degree in violation of General Statutes §§ 53a-94 (a) and 53a-

---

[1] General Statutes § 53a-94 (a) provides: "A person is guilty of kidnapping in the second degree when he abducts another person."

49 (a) (2), and risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[2] He has raised a multitude of issues. We agree with his constitutional attacks on two of these convictions, but we affirm his conviction of attempt to commit kidnapping in the second degree. In particular, we hold that the trial court properly admitted into evidence a noose found in the defendant's car and excluded an inconsistent statement by the victim's mother about the date of the incidents in question. The judgment is therefore affirmed in part and reversed in part.

The jury reasonably could have found the following facts. On the evening of July 19, 2002, at approximately 6 p.m., the twelve year old female victim was walking alone on Spruce Street in Manchester when she noticed a green car moving slowly along the opposite side of the street. The defendant, the driver of the car, stopped the car in the middle of the road and lowered the driver's side window. He pointed his finger at the victim and yelled, "I'm going to get you. You're getting in my car." He then got out of the car and walked across Spruce Street toward the victim with his arms stretched in front of him as if he was going to give the victim a bear hug. When he was approximately six feet from the victim, she ran away toward her house on Bissell Street. It took her only a matter of seconds to reach her house, where she told her mother what had transpired. The incident was not reported to the police.

Four days later, on July 23, 2002, at approximately 5 p.m., the victim was again walking home on Spruce

---

[2] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony . . . ."

Street when she noticed the same green car and driver. The defendant stopped the vehicle and rolled down the window. This time, without saying anything to the victim, he left the car and began walking toward her. She began to walk faster, but the defendant forcibly took her right arm. When she asked him to let go, he refused, yelling, "[n]o, its too wet out here; you're getting in my car today." He tried to pull her toward his car, but she resisted, pulling back in the opposite direction. To get him to release her, the victim then leaned over to bite the defendant, at which point he quickly let go and rushed back to his car. In doing so, the defendant was almost hit by a maroon car. Upon being released, the victim ran home and told her mother what had transpired. The entire incident lasted only a few seconds.

The victim's mother called the police, and the victim gave a signed statement regarding the incidents, which took place on July 19 and 23, 2002. The victim also provided the police with a license plate number.

The police traced the license plate number to the defendant. Upon arriving at his residence that same day, the police observed a turquoise Ford Thunderbird with plates matching the number provided by the victim. Officer David Evans of the Manchester police department asked the defendant whether he had been on Spruce Street around 5 p.m. Although the defendant admitted that he had driven through that area on his way home from work, he initially denied having spoken to anyone. Subsequently, however, he admitted to Sergeant Jeffrey Lampson that he had offered a young woman a ride. The police brought the victim to the defendant's house, where she positively identified him as the man who had approached her on both occasions. The defendant was then arrested, handcuffed and placed in a police cruiser. Thereafter, Officer Evans obtained the defendant's permission to search his car.

The subsequent search revealed a rope noose and various debris in the trunk. Only the noose was seized. At the police station, the defendant admitted that on his way home from work, he had offered a young girl a ride home because it was raining, but denied any wrongdoing.

In a three count substitute information, the state charged the defendant with attempt to commit kidnapping in the second degree in violation of §§ 53a-94 (a) and 53a-49 (a) (2), kidnapping in the second degree in violation of § 53a-94 (a) and risk of injury to a child in violation of § 53-21 (a) (1). After the jury found the defendant guilty on all three counts, the trial court denied the defendant's motions for a new trial and for a judgment of acquittal. The court sentenced the defendant to eight years imprisonment followed by ten years of special parole.[3]

In his appeal from this adverse judgment, the defendant challenges the validity of each of his convictions. With respect to the charges of attempt to commit kidnapping in the second degree and kidnapping, he claims that, as applied in the circumstances of this case, § 53a-94 is unconstitutionally vague. The defendant also claims that the court should not have admitted into evidence the noose found in his car but, having done so, improperly precluded him from presenting evidence about a recent suicide attempt, and that the court improperly excluded a statement by the victim's mother. With respect to his conviction of risk of injury to a child, he claims that § 53-21 is unconstitutionally vague, the evidence was insufficient to support his con-

---

[3] More specifically, the court ordered the defendant committed to the custody of the commissioner of correction: on count one, for eighteen years, eight years incarceration followed by ten years special parole, three years mandatory minimum; on count two, for eighteen years, eight years incarceration followed by ten years special parole, three years mandatory minimum; and, on count three, for eight years, concurrent with counts one and two.

viction, the state improperly was permitted to alter its theory of prosecution and the court misinstructed the jury.

## I

We first address the defendant's claim that he was convicted improperly of having violated our kidnapping statute, § 53a-94 (a). His principal claim is that, as applied to his conduct in this case, the statute is unconstitutionally vague. He does not contest the sufficiency of the evidence presented by the state. Instead, he argues that, in light of the minuscule amount of restraint imposed on the victim, § 53a-94 (a) failed to put him on fair notice that his conduct was prohibited. We agree.

The constitutional injunction that is commonly referred to as the void for vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . [The doctrine] embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . The United States Supreme Court has emphasized that the more important aspect of the vagueness doctrine is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Thus, [i]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited . . . and must not impermissibly [delegate] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . Finally, [i]f the meaning of a statute can be fairly ascertained a statute will not

be void for vagueness . . . for [i]n most English words and phrases there lurk uncertainties. . . . [T]he statute must contain some core meaning within which the defendant's actions clearly fall. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . . For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 83 Conn. App. 142, 157–58, 848 A.2d 1246, cert. denied, 270 Conn. 915, 853 A.2d 530 (2004).

In challenging the constitutionality of a statute, the defendant bears a heavy burden. To prevail on his vagueness claim, "[t]he defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement." (Internal quotation marks omitted.) *State* v. *Springmann*, 69 Conn. App. 400, 407, 794 A.2d 1071, cert. denied, 260 Conn. 934, 802 A.2d 89 (2002). "On appeal, a court will indulge in every presumption in favor of a statute's constitutionality. . . . If a penal statute provides fair warning, it will survive a vagueness attack." (Internal quotation marks omitted.) *State* v. *DeJesus*, 91 Conn. App. 47, 84, 880 A.2d 910 (2005). "This court must . . . look to see whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) Id., 84–85.

With these principles in mind, we turn to the specifics of this case. "A person is guilty of kidnapping in the second degree when he abducts another person." Gen-

eral Statutes § 53a-94 (a). General Statutes § 53a-91 (2) defines "abduct" as "restrain[ing] a person with intent to prevent his liberation by . . . using or threatening to use physical force or intimidation." The term "restrain" is defined in § 53a-91 (1) as "restrict[ing] a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent . . . ."

Our Supreme Court recently emphasized that "common notions regarding the crime of kidnapping envisage the carrying away of a person under coercion and restraint. Although this type of movement undoubtedly can serve as the basis for kidnapping, our kidnapping statute does not require such movement. Rather, all that is required under the statute is that the defendant have abducted the victim. . . . Under the aforementioned definitions, the abduction requirement is satisfied when the defendant restrains the victim with the intent to prevent her liberation through the use of physical force. Further, the victim is restrained when the defendant . . . moves her from one place to another *or* restricts her movement by confining her in the place where the restriction commenced. Nowhere in this language is there a requirement of movement on the part of the victim. Rather, we read the language of the statute as allowing the restriction of movement alone to serve as the basis for kidnapping. Therefore, the relevant inquiry under our kidnapping statute is whether any movement, or restriction of movement, was accomplished with the intent to prevent the victim's liberation. . . . Thus, any argument imputing a temporal requirement . . . for abduction under the kidnapping statute must fail." (Citations omitted; emphasis in original.)

*State* v. *Luurtsema*, 262 Conn. 179, 201–202, 811 A.2d 223 (2002).

Count two of the amended information alleged that "on July 23, 2002 near the intersection of Bissell Street and Spruce Street in Manchester, Connecticut at approximately 5:00 p.m., the defendant restrained a twelve (12) year old girl with the intent to prevent her liberation by using physical force and intimidation, including but not limited to: driving his car down Spruce Street and stopping it alongside the girl, exiting the vehicle, approaching the girl, grabbing her arm, holding on to her, telling her to get into his vehicle, trying to drag her into his car, where he had a noose made of rope and duct tape." The defendant argues that § 53a-94 (a) failed to provide him fair notice that this brief encounter, in which he forcibly took her arm but did not move her, was criminal misconduct.

Although the appellate courts of this state have often rejected similar claims,[4] our Supreme Court consistently has recognized that there may be factual circumstances involving "the most minuscule" movement or

---

[1] This case is readily distinguishable from those cases in which challenges to the kidnapping statutes as unconstitutional as applied have been considered and rejected. In each of those cases, the evidence revealed that the defendant moved or confined the victim in a significant manner. In *State* v. *Jones*, 215 Conn. 173, 575 A.2d 216 (1990), our Supreme Court upheld a conviction pursuant to General Statutes § 53a-92 (a) (2) (A) of a defendant who had dragged a jogger from a jogging path into a nearby wooded area. In *State* v. *Ortiz*, supra, 83 Conn. App. 142, this court concluded that a defendant had constitutional warning of a violation of our kidnapping statute when he carried the victim away from a police station and forcibly took her by the coat to prevent her from escaping. Those facts, we held, "do not support the defendant's contention that these actions comprised a 'minuscule movement . . . .' " Id., 159–60; see also *State* v. *Troupe*, 237 Conn. 284, 289, 677 A.2d 917 (1996) (preventing victim from leaving apartment); *State* v. *Tweedy*, 219 Conn. 489, 493–94, 594 A.2d 906 (1991) (using gun to force victim to move from one place to another); *State* v. *Hill*, 58 Conn. App. 797, 799, 755 A.2d 919 (forcing victim from street, into parking lot, and under stairwell and onto ground), cert. denied. 254 Conn. 936, 761 A.2d 763 (2000).

duration of confinement in which a conviction for kidnapping would be absurd and unconscionable. See *State* v. *Luurtsema*, supra, 262 Conn. 203–204; *State* v. *DeJesus*, supra, 91 Conn. App. 89–90. The question is whether this is such a case. We conclude that it is.

We have, indeed, recognized the distinction between assault and kidnapping. Recently, in *State* v. *DeJesus*, supra, 91 Conn. App. 47, we reversed a conviction for kidnapping in the first degree under General Statutes § 53a-92 (a) (2) (A)[5] because, in our view, the statute was unconstitutionally vague as applied to conduct by the defendant that involved the exercise of only a minimal amount of restraint of the victim. *State* v. *DeJesus*, supra, 97. In that sexual assault case, a supermarket manager instructed a young victim with limited mental abilities to go to a room in the store where he disrobed her and penetrated her. Id., 50–51. He did not, however, prevent her from immediately leaving when the assault was over. Id., 51. On the basis of those facts and circumstances, we concluded that § 53a-92 (a) (2) (A) did not place the defendant on notice that his conduct in sexually assaulting the victim violated the kidnapping statute. Id., 97. In so concluding, we noted that "[t]here was no testimony as to the duration of the assault or how long the two were in the room. There was no evidence as to any amount of force used by the defendant at any point. Furthermore, it is unclear whether the defendant restrained the victim at any time because

---

[5] General Statutes § 53a-92 (a) provides: "A person is guilty of kidnapping in the first degree when he abducts another person and: (1) His intent is to compel a third person (A) to pay or deliver money or property as ransom or (B) to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function." The term "abduct," as it is used in both General Statutes §§ 53a-92 and 53a-94, is defined in General Statutes § 53a-91 (2).

the evidence demonstrated that she was able to leave the room without being stopped." Id., 96.

In this case, the evidence reveals that the only restraint imposed on the victim was the defendant's forcibly taking the victim's arm and pulling on it for a few seconds. We conclude, therefore, that the evidence of the movement and confinement in this case falls into the realm of the "minuscule" movement or duration of confinement. To hold that the defendant was put on notice that this conduct would violate the kidnapping statute, § 53a-94 (a), would be an absurd and unconscionable result. Moreover, to allow such a conviction to remain would risk the encouragement of arbitrary and discretionary enforcement of the kidnapping statute by overzealous prosecutors. Accordingly, we reverse the judgment of the trial court on this count.

## II

The defendant was convicted not only of kidnapping in the second degree but also of attempt to commit kidnapping in the second degree[6] under §§ 53a-94 (a) and 53a-49 (a) (2). He has raised no constitutional claims with respect to the latter conviction. He argues instead that improper evidentiary rulings by the trial court require us to set aside this conviction as well. Specifically, he maintains that the court improperly admitted the rope noose seized from his car and refused to admit the testimony of the victim's mother, and that

[6] Count one of the amended information alleged that "on July 19, 2002 near the intersection of Bissell Street and Spruce Street in Manchester, Connecticut at approximately 6:00 p.m., the defendant, with intent to restrain a twelve (12) year old girl and prevent her liberation by using physical force and intimidation, intentionally committed an act constituting a substantial step towards causing her kidnapping, including but not limited to: driving his car slowly down Spruce Street and stopping it alongside the girl, rolling down the driver's side window, pointing his finger at the girl, saying 'I'm going to get you—you are going in my car,' exiting the car, opening his arms, and saying 'I am going to get you.' "

these allegedly improper evidentiary rulings entitle him to a new trial.

As a preliminary matter we set forth the applicable standard of review. "Our standard of review for evidentiary matters allows the trial court great leeway in deciding the admissibility of evidence. The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. . . . The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law. . . . And [it] requires a knowledge and understanding of the material circumstances surrounding the matter . . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Marsala*, 93 Conn. App. 582, 591, 889 A.2d 943, cert. denied, 278 Conn. 902, 896 A.2d 105 (2006).

A

The defendant's claim with respect to the admission of the noose is multifaceted. The defendant argues that the trial court improperly (1) denied his motion to suppress the noose because his consent to the warrantless search was not voluntary, (2) decided that the admission of the noose into evidence was more probative than prejudicial and (3) excluded evidence of his prior suicidal ideation to explain the presence of the noose in the car. We are not persuaded by the defendant's arguments.[7]

---

[7] In his brief and at oral argument, defense counsel repeatedly chastised the state for focusing on the noose at trial. Significantly, the defendant has not raised a claim of prosecutorial misconduct in his appeal, but rather has belabored his dissatisfaction with the court's ruling by attacking the strategy

We first address the defendant's claim that the trial court improperly denied his motion to suppress. Specifically, the defendant argues that the court's finding that he voluntarily consented to the warrantless search of his car was not supported by the facts presented at the suppression hearing and is legally incorrect. We disagree.

Before addressing the merits of the defendant's claim, we again set forth the applicable standard of review. "[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 92, 890 A.2d 474 (2006).

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." (Citations omitted; internal quotation marks omitted.) *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). "Whether a defendant voluntarily has consented to a search is a question of fact to be determined by the trial court from the totality

of opposing counsel. Once the noose was admitted as a full exhibit, the state was well within its rights to question witnesses about it and to argue its relevance to the jury.

of the circumstances based on the evidence that it deems credible along with the reasonable inferences that can be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Nowell*, 262 Conn. 686, 699, 817 A.2d 76 (2003). The ultimate question is whether the will of the consenting individual was overborne or whether the consent was his unconstrained choice. *Schneckloth* v. *Bustamonte*, supra, 225–26.[8]

In this case, the court held a three day hearing on the defendant's motion, during which it heard testimony from seven witnesses: Officer Evans and Sergeant Lampson, who spoke to the defendant at his home; Detective Max Cohen, who interviewed the defendant at the police station; Donna Gaura, a police services aide at the Manchester police department; Jean Tuneski, an audiologist; Harold Levarek, a pharmacist; and Irene Winot, the defendant's mother. The defendant argued that "his custodial status, [the] absence of any notice of rights, his consumption of alcohol and prescription medication, his psychologically fragile state, and his

---

[8] Although, the defendant also claims that there was a violation of his rights under article first, § 7, of the constitution of Connecticut, we resolve the defendant's claim on federal constitutional grounds because the defendant did not adequately brief his state constitutional claim. In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), our Supreme Court enumerated a six factor test for analyzing independent claims under the Connecticut constitution. "Those factors are: (1) the text of the operative constitutional provisions; (2) related Connecticut precedents; (3) persuasive relevant federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebearers; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." *State* v. *Brunetti*, 276 Conn. 40, 52, 883 A.2d 1167 (2005). "We repeatedly have emphasized that we expect counsel to employ [the *Geisler* analysis] [i]n order to [allow us to] construe the contours of our state constitution and [to] reach reasoned and principled results. . . . When a party fails to analyze these factors separately and distinctly, [w]e have made clear that . . . we are not bound to review the state constitutional claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 154 n.26, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

severely impaired hearing ability rendered it impossible for him to have freely and knowingly consented to the search."

The court orally denied the defendant's motion to suppress, and later issued a written memorandum of decision articulating the basis of its decision and making specific findings regarding the issue. On the basis of elaborate findings,[9] the court found that "the defendant

---

[9] The court found: "Officers Evans and [Scott] Plourde . . . approached the house and knocked on the door. Mrs. Irene Winot, the defendant's mother answered, and Officer Evans asked for [the defendant]. When [the defendant] came to the door . . . Officer Evans asked [the defendant] if he had recently driven his car in the area of Spruce and Bissell Streets and [the defendant] answered yes. At this time, Officer Evans did not smell any alcohol on the defendant's breath, nor did [the defendant] act in a way that would lead Officer Evans to believe he was under the influence of alcohol. . . .

"Sergeant Jeffrey Lampson then arrived. . . . Sergeant Lampson asked [the defendant] if he had been in the area of Bissell and Spruce Streets. At first [the defendant] denied this, but admitted being in the area when asked again. Although Sergeant Lampson noticed an odor of alcohol, he did not question [the defendant] about it because [the defendant] had no loss of balance, no trouble communicating and no slurred speech. Sergeant Lampson did not believe [that the defendant] appeared to be under the influence of alcohol.

"Shortly thereafter, Officer [Aaron] Calkins pulled up to 134 Benton Street with the victim, a twelve year old female sitting in the passenger's seat of his police cruiser. . . . [The defendant] was then walked out to the street for identification. At that time, [the defendant] was not handcuffed and there was no struggle between [the defendant] and the officer walking him to the street. None of the police officers present at the scene had their weapons drawn.

"When the victim viewed the defendant . . . [she] identified [him] as the perpetrator. At this time, [the defendant] was placed under arrest by Officer Evans and was placed in the backseat of a police cruiser.

"Officer Evans asked [the defendant] if the officers could search his car and [the defendant] consented. The officers found nothing in the interior of the car. When searching in the trunk of the car, the officers found and seized a noose made of rope and a magazine about women's hairstyles. . . .

"Although there was testimony offered regarding [the defendant's] hearing ability and the possible effect noise from rain could have on his hearing, at no time during his conversations with the Manchester police officers did [the defendant] appear to be confused, state that he was unable to hear or

voluntarily consented to the search of his car. At all times, the defendant appeared to understand the questions being asked of him and never stated anything to the contrary. The defendant never asked questions about what was happening, nor did he have any trouble communicating with the officers. There was no evidence presented that the defendant was coerced or that his consent to search his car was not of his own free will."

The defendant argues that the trial court's finding of consent was clearly erroneous because, in his view, the record does not support the court's underlying findings that he did not have diminished capacity and that he could hear the request to search. We disagree. The court

ask for things to be repeated. Therefore, it is found that [the defendant] was able to hear what was being said to him.

"Shortly after arriving at the Manchester police department, at approximately 6:30 p.m., [the defendant] met with police services aide Donna Guara. Gaura informed [the defendant] of his rights, booked him and asked him questions regarding his mental state. . . . Guara testified that [the defendant] was visibly upset during the time she was questioning him. Guara also testified that [the defendant] did not appear to be under the influence of alcohol even though he stated that he had a vodka tonic earlier. [The defendant] told Guara his social security number, and Gaura checked the number [the defendant] gave her against [the defendant's] previous police record. . . . During her questioning of [the defendant], Guara also became aware of prescription medications that [the defendant] was currently taking for psychological problems. Guara's questioning of [the defendant] took approximately fifteen to twenty minutes. . . .

"At approximately 8 p.m., Guara administered one pill of Desyrel, one pill of Wellbutrin and two pills of Geodon to [the defendant]. Pharmacist Harold Levrek testified that it would take approximately thirty minutes for these specific medications to take effect and that the amount of drowsiness caused by these medications varies on an individualized basis.

"Shortly after the administration of the prescription medications, [the defendant] was taken from his cell into an interview room and interviewed by Detective Max Cohen in the presence of Sergeant John Maston. . . . Although Detective Cohen smelled alcohol on [the defendant's] breath, [the defendant] stated he only had one beer after work. [The defendant] answered all of the questions asked in a logical manner and did not appear intoxicated. At approximately 8:50 p.m., [the defendant] became very sleepy and started to nod off. At this point, Detective Cohen stopped the interview and returned [the defendant] to his cell."

carefully considered all of the relevant evidence and its findings must be sustained.

The defendant also argues that the trial court's factual finding must be set aside because the court improperly failed to consider that, at the time he consented to the search, he was in custody and had not been advised of his right to refuse consent or of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We are not persuaded.

"[C]onsent to search may be voluntary even though the consenting party is being detained at the time consent is given . . . and law enforcement agents fail to advise him of his *Miranda* rights." (Citations omitted; internal quotation marks omitted.) *United States* v. *Dozal*, 173 F.3d 787, 796 (10th Cir. 1999). "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under [*Schneckloth* v. *Bustamonte*, supra, 412 U.S. 218], the absence of proof that [the defendant] knew he could withhold his consent . . . is not to be given controlling significance." *United States* v. *Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976) (upholding finding of voluntariness where defendant had been arrested and given *Miranda* warnings but not informed of his right to refuse consent).

There is nothing in this record to indicate that this defendant was unable, even in the face of a custodial arrest, to exercise a free choice. He was thirty-five years old. He does not claim to have been threatened in any way by anyone at the scene. He has not alleged that improper promises were made to him or that he was subjected to any other more subtle forms of coercion that might improperly have impaired his judgment. When asked if the police could search his car, he responded, "Sure," and that was it.

In light of the totality of the circumstances, we are persuaded that there was a reasonable basis for the trial court's finding that the defendant voluntarily consented to the search. The court, therefore, properly denied the defendant's motion to suppress.

We next address the defendant's claim that the court improperly admitted the noose and evidence about the circumstances surrounding its discovery because such evidence was irrelevant and immaterial to the charges against him and highly prejudicial. We are not persuaded.

Section 4-1 of the Connecticut Code of Evidence provides that evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Relevant evidence may be excluded, however, "if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3.

The noose was offered into evidence during the direct examination of Officer Evans. The court overruled the defendant's objection, indicating that it had done the balancing test and that "at this stage of the evidence . . . there is potentially a significant link between the charges and the rope . . . ."[10] The court later explained, in response to an objection by defense counsel to the state's closing argument, that it had allowed the rope into evidence because it was relevant to establish the defendant's intent to restrain the victim.

---

[10] The court also denied the defendant's motion for a mistrial, which claimed, inter alia, that the state had failed to connect the noose to any of the crimes charged.

The defendant's claim that the noose had no probative value cannot be sustained in light of the state's burden of proving that the defendant intended to restrain the victim by "using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2). A rope fashioned into a noose may be an instrument of restraint. "Relevant evidence is evidence that has a logical tendency to aid the trier [of fact] in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive." (Internal quotation marks omitted.) *State v. Cummings*, 91 Conn. App. 735, 743, 883 A.2d 803, cert. denied, 276 Conn. 923, 888 A.2d 90 (2005). The fact that the noose was discovered in the debris filled trunk of the defendant's car and might reasonably have other uses goes to the weight of the evidence and not to its admissibility.

The defendant claims that even if the noose was relevant, the prejudicial effect of its admission outweighed any probative value. Specifically, the defendant argues that the admission of the noose unduly aroused the jurors' emotions and created a distracting side issue as to the defendant's mental health. We disagree.

"Unfair prejudice exists when the evidence tends to have some adverse effect upon [the party against whom the evidence is offered] beyond tending to prove the fact or issue that justified its admission into evidence." (Internal quotation marks omitted.) *State v. Harris*, 277 Conn. 378, 387–88, 890 A.2d 559 (2006). "[T]here are [certain] situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2)

where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) Id., 391.

We conclude that admission of the noose under the circumstances of this case was not invidious. The record is clear that the defendant anticipated the evidence because he filed a motion in limine to preclude its admission. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the noose into evidence.

The defendant's final claim on this issue is that, once the court admitted the noose into evidence, he was entitled to present evidence that its presence in the trunk of his car could be explained because of a prior suicide attempt on his part and by his depression. According to the defendant, the court's contrary ruling deprived him of his right to present a defense under the sixth amendment to the constitution of the United States.[11] We disagree.

The defendant's claim is based on the testimony of Detective Cohen, who questioned the defendant at the police station. The defendant told Cohen that he suf-

[11] The defendant's constitutional claim requires us to resolve three questions. "First, whether the court's ruling was improper. . . . Should we answer that question in the negative, we need go no further. Should we answer that question in the affirmative, the second question we must answer is whether that impropriety rises to the level of a constitutional violation. . . . Should we answer that question in the affirmative as well, the third question we must answer is whether the state has demonstrated that the constitutional impropriety was harmless beyond a reasonable doubt. . . . A negative answer to this third question will warrant a new trial." (Citations omitted.) *State* v. *Tutson*, 84 Conn. App. 610, 622, 854 A.2d 794, cert. granted on other grounds, 271 Conn. 935, 861 A.2d 511 (2004).

fered from depression, had contemplated suicide and in one instance had placed the noose around his neck. In an effort to corroborate this statement, the defendant sought to introduce evidence of a suicide attempt in March, 2002, four months prior to his arrest. The evidence proffered included hospital records and testimony from the defendant's mother.

The court excluded the evidence as irrelevant. "The proffering party bears the burden of establishing the relevance of the offered [evidence]. Unless a proper foundation is established, the evidence is irrelevant." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 289, 833 A.2d 363 (2003). "[O]ur law is clear that a defendant may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right [to present a defense] is not violated." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 198–99, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

The court noted that the medical records indicated only that the defendant had told medical personnel that he had attempted to commit suicide by overdosing on his prescription medication. It observed that a toxicology report indicated that the defendant had tested negative for each of the substances tested, with the exception of alcohol. In light of this evidence, the court declined to have a trial within the trial on whether the defendant had in fact taken an overdose.[12]

---

[12] The trial court declined to reconsider its ruling on the ground that the defendant's urine was not tested for the presence of Seroquel (dibenzodiazepine), one of the defendant's prescription medications. The defendant's urine had been tested for benzodiazepine. The state toxicologist, with whom defense counsel spoke, however, did not know if a test for benzodiazepine would necessarily detect the presence of dibenzodiazepine. The court ruled that "[s]omething they didn't test him on sixteen weeks before this incident is irrelevant and is out."

Our review of the record persuades us that the trial court reasonably could have concluded that the defendant failed to establish the necessary factual predicate that he actually took an overdose of medication in March, 2002. The court, therefore, properly excluded the proffered evidence.[13]

## B

We next address the defendant's claim that the court deprived him of his right to present a defense under the sixth amendment to the United States constitution by refusing to allow him to present the testimony and a prior sworn statement of the victim's mother. We are not persuaded.

The following additional facts are relevant to our resolution of this claim. Prior to driving the victim to the defendant's house for the identification, Officer Aaron Calkins interviewed both the victim and her mother. The victim told Calkins about the incident that had just occurred and the one that had taken place on July 19. Calkins prepared a written statement, read it to the victim and had her sign it under oath. The statement

---

[13] Even if the trial court's ruling was improper, the error was harmless. The record reveals that the defendant was able to put before the jury his defense that the noose was in the car because he was suicidal. Detective Cohen testified that the defendant told him he was depressed and suicidal and had placed the noose around his neck. Through Guara, a redacted copy of the suicide screen performed on the night of the defendant's arrest was admitted; it indicated that the defendant was put on suicide watch. Irene Winot, the defendant's mother, testified that the defendant was living with her at the time of his arrest and that she dispensed medications to him on a daily basis. Roy David Katz, the pharmacist who dispensed the medications prescribed to the defendant, testified that two were antidepressants and the third was an antipsychotic medication. Defense counsel, in closing argument, argued that "the only reason that [the] noose was in the car was it was to be used by a fellow who was depressed, who has been on antidepressants for months. And when you ask yourself, is it a reasonable inference for you to ask yourself why has a person been on antidepressants? Because they are depressed. And when people are depressed, what do they do? They contemplate suicide."

indicated, in error, that the forcible taking incident had taken place on July 19 and the yelling incident had taken place on July 23. At trial, the victim testified that, two weeks earlier, she had reread the statement and noticed that the dates were mixed up. She also testified that she was not the one who had mixed them up and that she accurately had reported to her mother what had taken place on the respective dates. Calkins testified that the statement reflected what the victim had told him on July 23 about the sequence of events.

After the close of the state's case-in-chief, defense counsel announced his intention to call the victim's mother and, through her, to offer a prior inconsistent statement to impeach the credibility of the victim. Counsel indicated that he anticipated that she would testify, consistently with her written statement, that the forcible taking incident had taken place on July 19 and the yelling incident had taken place on July 23. After the state claimed that the mother would contradict her sworn statement, the defendant indicated he would introduce her written statement for substantive purposes under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). In *Whelan,* our Supreme Court adopted a rule allowing the substantive use of prior written inconsistent statements where the declarant: "(1) has signed the statement; (2) has personal knowledge of the facts stated; and (3) testifies at trial and is subject to cross-examination." (Internal quotation marks omitted.) *State* v. *Pierre,* supra, 277 Conn. 58. This rule has been codified in § 8-5 (1) of the Connecticut Code of Evidence.[14] The state objected, arguing that the defen-

---

[14] Connecticut Code of Evidence § 8-5 provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial: (1) . . . A prior inconsistent statement of a witness, provided (A) the statement is in writing, (B) the statement is signed by the witness, and (C) the witness has personal knowledge of the contents of the statement. . . ."

dant was calling the mother merely for the purpose of impeaching the credibility of the victim, in violation of § 6-4 of the Connecticut Code of Evidence.[15] The state argued further that the statement was hearsay and that offering it for impeachment purposes was "a mere subterfuge for introducing substantively inadmissible evidence." Outside of the presence of the jury, the mother repudiated her statement, and the court sustained the state's objection and excluded the "[s]ubterfuge testimony . . . ."

"A party may impeach his own witness in the same manner as an opposing party's witness . . . ." *State* v. *Graham*, 200 Conn. 9, 17, 509 A.2d 493 (1986). This right includes impeachment by use of prior inconsistent statements. Id. A party may not, however, "use a prior inconsistent statement under the guise of impeachment for the primary purpose of placing before the jury evidence which is admissible only for credibility purposes in hope that the jury will use it substantively." Id., 18; see also Conn. Code Evid. § 6-4. "The introduction of the [prior inconsistent] statement is improper . . . where the primary purpose of calling the witness is to impeach him and the [party] introduces the prior inconsistent statement in hope that the jury will use it substantively." (Internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 531, 529 A.2d 653 (1987).

The *Whelan* rule does not, however, authorize admission of the mother's testimony in this case if it is inadmissible on some other ground. In this case, that other ground is hearsay because the mother's testimony purported to report the statements of her daughter, the

---

[15] Connecticut Code of Evidence § 6-4 provides: "The credibility of a witness may be impeached by any party, including the party calling the witness, unless the court determines that a party's impeachment of its own witness is primarily for the purpose of introducing otherwise inadmissible evidence." See also *State* v. *Graham*, 200 Conn. 9, 17–18, 509 A.2d 493 (1986).

victim. *Whelan* does not authorize the admission of statements excluded by the hearsay rule. See *State* v. *Pierre*, supra, 277 Conn. 64–65. The defendant has failed to suggest the existence of an exception to the hearsay rule that would warrant the admission of those statements.[16]

It is clear that the defendant's primary purpose in calling the mother to testify, after being informed that she would recant, was to impeach her. In impeaching her, the defendant's objective was to get the statement before the jury with the intent that it be used substantively to impeach the credibility of victim. We hold, therefore, that the statement properly was excluded.

In sum, we conclude that the trial court properly presided over the proceedings that led the jury to find the defendant guilty of the crime of attempt to commit kidnapping in the second degree. The court properly ruled that the noose found in the defendant's car was admissible to establish his intent to kidnap the victim. The defendant consented to the search of the car, and the evidence was more probative than prejudicial. The defendant did not establish a compelling basis for his assertion that the noose was related to a prior attempt to commit suicide. Finally, the defendant's constitutional rights were not impaired by the court's ruling on the defendant's *Whelan* claim. Accordingly, the defendant's conviction of attempt to commit kidnapping must be affirmed.

---

[16] Even if there were an exception to the hearsay rule that applied to the victim's statements, it was still within the court's discretion to exclude those statements as irrelevant. The mother's statement was offered solely for the purpose of presenting extrinsic evidence of the prior inconsistent statement of the victim on a collateral matter, the dates of the offenses charged. See *State* v. *Valentine*, 240 Conn. 395, 403, 692 A.2d 727 (1997) ("As a general rule, extrinsic evidence of a prior inconsistent statement may not be admitted to impeach the testimony of a witness on a collateral matter. . . . Thus, on cross-examination, a witness' answer regarding a collateral matter is conclusive and cannot be contradicted later by extrinsic evidence. [Citation omitted.]").

## III

Finally, we address the defendant's claim that the trial court improperly denied his motions for a judgment of acquittal and for dismissal of the charge of risk of injury to a child in violation of § 53-21 (a) (1). Although the defendant raises a number of issues with respect to this conviction, one is dispositive. The defendant argues that the evidence at trial was insufficient to support this conviction because the state failed to prove that his behavior was likely to injure the physical health of the victim.[17] We agree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the [decision]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support the [decision]." (Internal quotation marks omitted.) *State* v. *Jones*, 93 Conn. App. 200, 203–204, 888 A.2d 180, cert. denied, 277 Conn. 920, 895 A.2d 790 (2006). "[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established

[17] At oral argument in this court, counsel for the state conceded that it was not relying on any physical symptoms of emotional trauma to support the conviction of risk of injury to a child. Such evidence was offered at trial to demonstrate the intimidation necessary for the kidnapping offense and under a mistaken belief that it was relevant to the likelihood of injury under the acts prong of the risk of injury statute. See *State* v. *Payne*, 240 Conn. 766, 695 A.2d 525 (1997), overruled in part on other grounds by *State* v. *Romero*, 269 Conn. 481, 490, 849 A.2d 760 (2004). The court explicitly charged the jury that it could not rely on such evidence in its finding of risk of physical injury.

guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Mulero*, 91 Conn. App. 509, 513, 881 A.2d 1039 (2005), cert. denied, 277 Conn. 912, 895 A.2d 792 (2006).

To prevail in this case, the state was required to demonstrate that the defendant violated § 53-21 by impairing a child's physical or psychological well-being. Section 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

It is well settled under our case law that § 53-21 is comprised of two distinct parts and criminalizes "two general types of behavior likely to injure physically or to impair the morals of a minor under sixteen years of age: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the minor and injurious to his [or her] moral or physical well-being." (Internal quotation marks omitted.) *State* v. *Fagan*, 92 Conn. App. 44, 52, 883 A.2d 8, cert. denied, 276 Conn. 924, 888 A.2d 91 (2005). "Thus, the first part of § 53-21 (1) [now § 53-21 (a) (1)] prohibits the creation of *situations* detrimental to a child's welfare, while the second part proscribes injurious *acts* directly perpetrated on the child." (Emphasis in original.) *State* v. *Padua*, 273 Conn. 138, 148, 869 A.2d 192 (2005). This appeal concerns only the second portion of § 53-21 (a) (1).

Count three of the substitute information charged the defendant with violating § 53-21. It alleged "that on July 23, 2002 near the intersection of Bissell Street and Spruce Street in Manchester, Connecticut at approximately 5:00 p.m., the defendant did *an act* likely to impair the health of a twelve (12) year old girl, including but not limited to: driving his car down Spruce Street and stopping it alongside the girl, exiting the vehicle, approaching the girl, grabbing her arm, holding onto her, telling her to get into his vehicle, trying to drag her into his car, where he had a noose made of rope and duct tape." (Emphasis added.)

"The four elements the jury needed to find to return a verdict of guilty are: (1) the victim was less than sixteen years old; (2) the defendant committed an act upon the victim; (3) *the act was likely to be injurious to the victim's health* . . . and (4) the defendant had the general intent to commit the act upon the victim." (Emphasis added.) *State* v. *March*, 39 Conn. App. 267, 275, 664 A.2d 1157, cert. denied, 235 Conn. 930, 667 A.2d 801 (1995). The defendant does not deny that the jury reasonably could have found that he forcibly took the victim's arm and attempted to pull her toward his car. He maintains, however, that a reasonable trier of fact could not conclude that such behavior was likely to place the victim's health at risk.

At trial, the victim testified inconsistently with respect to whether she was injured when the defendant forcibly took her arm. On direct examination, she testified that she attempted to bite the defendant "[b]ecause I wanted him to get off my arm because he was hurting me." On cross-examination, however, she admitted that, although she told the police that the defendant "touched my arm," she did not tell them that he hurt her arm. On redirect examination, the victim reiterated that she had not told the police that she was hurt that night.

The state conceded at oral argument[18] that even when construed in the light most favorable to the state, the evidence that the defendant forcibly took and pulled on the victim's arm alone was insufficient to sustain a conviction for risk of physical injury under *State v. Schriver*, 207 Conn. 456, 542 A.2d 686 (1988).[19] The state urges us, therefore, to conclude that the defendant's conduct was culpable because it created a cognizable risk that the victim would be hit by traffic in the street.

The only evidence before the jury regarding traffic on Spruce Street was the victim's testimony on direct examination that, when the defendant let go of her arm and ran back to his car, "he almost got hit by a lady in a maroon car." The state failed to present any other evidence regarding the flow of traffic on Spruce Street in general or on the night of July 23, 2002, or the victim's

---

[18] Specifically, when asked whether the defendant's forcibly taking the child's arm, without the car in the street, would have been sufficient evidence, counsel for the state responded, "[p]robably not, Your Honor. . . . It is the package of the two."

[19] In *Schriver*, our Supreme Court held that prosecution under the second part of General Statutes § 53-21 was limited to those acts likely to impair the physical health of a child. *State v. Schriver*, supra, 207 Conn. 466. Accordingly, the court concluded that the defendant's conduct of forcibly taking a thirteen year old girl around the waist, while she was delivering newspapers, and uttering a sexual remark to her did not fall within the confines of § 53-21. Id., 457–58, 466. In so holding, the court noted that the type of conduct prohibited by § 53-21 had been limited by prior judicial gloss to instances of "deliberate, blatant abuse." Id., 466.

In 1995, the legislature amended § 53-21 as part of a broader initiative designed to strengthen penalties imposed on persons who commit sexual offenses against children and to require those persons to register as sex offenders. See Public Acts 1995, No. 95-142, § 1 (P.A. 95-142). The amendment added, in express terms, a sexual offense to § 53-21. The amendment, however, did not modify in any material respect the prior language of the statute that this court had interpreted. See P.A. 95-142, § 1. Rather, the amendment merely designated, as subdivision (1), the entire pre-1995 amendment version of the statute, except that part designating the maximum sentence and fine that could be imposed upon sentencing. Compare General Statutes (Rev. to 1995) § 53-21 with General Statutes (Rev. to 1997) § 53-21 (1). Subsequent amendment of § 53-21 designated subdivisions (1) and (2) as subsection (a) (1) and (2). See Public Acts 2000, No. 00-207.

proximity to such traffic if it existed. "Jurors are expected to bring their common sense and common experience to the deliberation process." *State* v. *Padua*, supra, 273 Conn. 159. We conclude, however, that the victim's statement alone, viewed in the light most favorable to the prosecution could not permit a rational trier of fact to conclude, without resorting to speculation and conjecture, that the defendant's conduct was likely to jeopardize the victim's physical health. Under these circumstances, we cannot say that the evidence reasonably supported the jury's conclusion that the defendant was guilty of risk of injury to a minor. The defendant's conviction on count three of the information must, therefore, be set aside.

The judgment is reversed with respect to the conviction of kidnapping in the second degree and risk of injury to a child and the case is remanded with direction to render judgment of not guilty of those crimes. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.